ROBERT R. POWELL, SBN: 159747
POWELL & ASSOCIATES
925 West Hedding Street
San Jose, California 95126
T: 408-553-0201 F: 408-553-0203
E: rpowell@rrpassociates.com

JOSEPH E. WEINBERGER, SBN: 136798
WEINBERGER LAW FIRM
1839 Iron Point Drive, Ste. 180
Folsom, CA 95630
T: 916-357-6767 F: 916-357-6766
E: joe@weinbergerlaw.net

Attorneys for PLAINTIFFS

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TAYLOR WEBB, individually and as Guardian Ad Litem for A.W., JEREMY WESTFALL,<br><br>                Plaintiffs,<br><br>   vs.<br><br>COUNTY OF STANISLAUS, APRIL COBBS, LAWRENCE JONES, PATRICIA TOUT, ERIC ANDERSON, CITY OF MODESTO, DOE 1, DOE 2, and DOES 3-10 inclusive,<br><br>               Defendants. | Case No.:<br><br>COMPLAINT FOR VIOLATION OF CIVIL RIGHTS [42 U.S.C. § 1983]<br><br><u>DEMAND FOR JURY TRIAL</u> |

1

# I.

## JURISDICTION AND VENUE

1.      PLAINTIFFS bring this lawsuit pursuant to 42 U.S.C. § 1983 to redress the deprivation by DEFENDANTS, at all times acting under color of state law, of rights secured to PLAINTIFFS under the United States Constitution, including the First, Fourth, and Fourteenth Amendments.

2.      Jurisdiction is conferred on this Court by 28 U.S.C. §§ 1343(3) and 1343(4), which provides for original jurisdiction in this Court of all suits brought pursuant to 42 U.S.C. § 1983.  Jurisdiction is also conferred by 28 U.S.C. § 1331(a) because the claims for relief derive from the United States Constitution and the laws of the United States.

3.      This Court has supplemental jurisdiction over PLAINTIFFS' state law causes of action pursuant to 28 U.S.C. § 1367(a).

4.      Venue properly lies in the Eastern District of California, in that the events and circumstances herein alleged occurred in the County of Stanislaus, and at least one defendant resides in the County of Stanislaus.

5.      This matter involves many minor children, one as a plaintiff.  In compliance with the Local Rules of this Court their names have been reduced to initials herein, even if full and complete in cited statement or document.

//

//

//

Complaint
Webb, et al. v. County of Stanislaus, et al.
U.S. District Court – Eastern District of California
Case No.

## II.

## PARTIES

**PLAINTIFFS**

6.      PLAINTIFF TAYLOR WEBB (hereafter "Taylor") and PLAINTIFF JEREMY WESTFALL (hereafter "Jeremy") at all times relevant herein, were residents of the County of Stanislaus, and the lawful biological parents of a daughter A.W., born ████ ██ 2019.

7.      The child's full name is known to Defendants and is being withheld herein, unless otherwise ordered by the court, to provide her some level of confidentiality.

8.      Prior to the removal of the children from the parents on October 31st, 2019, the parents had celebrated A.W.'s birth after a particularly complicated and strenuous birthing process that led to A.W.'s birth by C-Section on Taylor.  A.W. is Taylor's first child, though she had lived with and helped Jeremy raise his child B.W. and assisted with the care of Jeremy's other child for approximately nine (9) months prior to the events complained of herein.

9.      Jeremy's other child was K.W., a daughter age ten (10) at a time just prior to the events complained of, who was tragically in the end stages of a disease known as MSP3 Sanfilippo Syndrome, and had passed away on February 27th, 2019.

10.      Taylor also assisted Jeremy when he would have visits and spend time with his son G.W., age seven (7) at the time of the events complained of herein.  G.W. was a child with significant autism who was in the custodial care of a paternal aunt and uncle, but who freely visited with his father Jeremy.  Jeremy's time for such visits – for pretty much anything leisure or recreational really – was limited by the fact he lived in Modesto; but for the past three and a half years or so his work as a union mason took him to the San Francisco Bay

Area typically five (5) days a week, thus involving commutes both ways ranging from ninety (90) minutes to two and one-half hours.

11.     In addition, he would on occasion have to stay in the San Francisco Bay Area or the surrounding areas all week long in employee housing of some form or another due to the size and scope of the masonry project contracted by his employer.

12.     Together, Taylor and Jeremy, despite these somewhat arduous and challenging circumstances, were happy, healthy, enamored with their children, grateful for a large extended family support system on Jeremy's side of the family, and simply very much in love.

13.     Very shortly before the horrors visited upon them by Stanislaus County social workers and members of the Modesto Police Department to be described, they had rented a new and larger home in the Modesto area, where they could enjoy the anticipated expansion of their family due to the pending birth of A.W.

14.     What would under most circumstances be the happiest days of a couple's life, the lives of Jeremy Westfall and Taylor Webb were forever marked as a horrible memory when Defendants engaged in the grotesque abuse of power to be described below.

15.     PLAINTIFFS allege that the conduct and behavior described in this Complaint is absolutely typical and routine by the social workers of Stanislaus County's Community Services Agency.

16.     Taylor represents A.W. as Guardian Ad Litem for purposes of the filing of this Complaint.

**COUNTY OF STANISLAUS – MONELL POLICIES, PRACTICES & TRAINING**

17.     Defendant COUNTY OF STANISLAUS ("COUNTY") is a municipality in corporate form, organized and existing under the laws of the State of California, and has as an

Complaint
Webb, et al. v. County of Stanislaus, et al.
U.S. District Court – Eastern District of California
Case No.

administrative subunit thereof called the COMMUNITY SERVICES AGENCY (hereinafter "CSA"), both of which, and any administrative or executive subunits thereof, will be collectively referred to herein as COUNTY.

18.     CSA is from time to time referred to as "CPS" herein, which stands for Child Protective Services, and is a common title given to agencies such as CSA. When persons are quoted, it is very common that "CPS" is used herein because that is what they used when referring to the defendants, both individual and entity, because that is how agencies such as CSA are referred to in everyday public lexicon.

19.     COUNTY has in its employment various social workers, such as ANDERSON, TOUT, COBBS and JONES, the individually named Defendants herein, who by virtue of their employment are state actors within the meaning of that term in the jurisprudence of civil rights legislation embodied in 42 U.S.C. 1983.

20.     COUNTY promulgated, encouraged, and/or permitted, the policies, patterns, and practices described below, and as the moving force of which the individual defendants, and DOES 1 – 10, committed the acts or omissions complained of herein, and COUNTY condoned, ratified, and encouraged the conduct of the COUNTY employee-defendants as complained of herein, and also failed to train or inadequately trained the COUNTY employees and the herein named COUNTY employee-defendants in a manner exhibiting deliberate indifference to causing recurring violation of parent(s) and children(s) constitutional rights of familial association.

21.     As the employer of social workers such as TOUT, ANDERSON, COBBS and JONES, COUNTY had primary responsibility for the training, education, and supervision of social workers, including not yet determined supervisors of such employees, and

PLAINTIFFS are informed and believe and thereon allege that it was COUNTY which promulgated, encouraged, administered, and/or permitted the policies, practices, customs, and procedures under which, and as the moving force of which, the individual defendant employees of COUNTY committed the acts or omissions and constitutional violations complained of herein.

22.	Though not specified separately as a Claim for Relief in "headings" herein below, PLAINTIFFS contend and allege the COUNTY is liable for each of the actions complained of in each of the Claims for Relief below wherein the individually named COUNTY employee Defendants are alleged to have violated federal laws and/or constitutional rights of one or more Plaintiffs; such liability inuring to COUNTY by virtue of the law set forth in *Monell v. Department of Social Services*, 436 U.S. 658 (1978), and its progeny.

23.	PLAINTIFFS alleges that the COUNTY has policies, practices, and/or customs which contain the following features in their modus operandi; features that are constitutionally violative of parents' and children's rights on their face and yet perpetuated and pursued with deliberate indifference to the rights and safety of PLAINTIFFS herein, and families such as PLAINTIFFS' within Stanislaus County.

24.	Such policies, practices, and customs are as follows;

A)	A policy, practice, or custom authorizing and or ratifying without discipline, threat of discipline, or reprimand of social workers and/or their supervisors, the repeated removal of children from their parents or guardians without a warrant, consent, or imminent risk of serious bodily injury to [a] child[ren]; taking [a] child[ren] when there is sufficient time to obtain a warrant and there are less intrusive means of protecting the child[ren] from whatever the social workers perceived imminent risk of serious bodily injury to the child[ren] might be,

6

and for which the result of said policy has been thousands of lawless removals of child[ren] from parents and/or the separation of children from parents in Stanislaus County over the past several years violating both the parents' and child[ren]'s constitutional rights of procedural and substantive due process under the U.S. Constitution and the amendments thereto.

B)   A policy, practice, or custom of removing sibling[s] of children who are targeted for removal and/or are removed from their home, parents, or lawful guardians when there has not been so much as an "allegation" of abuse or neglect of the sibling[s], and again regardless of the absence of any imminent risk of serious bodily injury to [a/the] child[ren], taking [a/the] child[ren] when there is sufficient time to obtain a warrant and there are less intrusive means of protecting the child[ren] from whatever the social workers perceived risk of serious bodily injury to the child[ren] might be, and for which the result of said policy, practice, or custom, has been thousands of lawless removals of child[ren] from parents and/or the separation of children from parents in Stanislaus County over the past several years violating both the parents' and child[ren]'s constitutional rights of procedural and substantive due process under the U.S. Constitution and the amendments thereto. This policy and/or the unwritten practice or custom of social workers and/or their supervisors, a policy, practice and/or custom routinely referred to by COUNTY social workers and supervisors as "take one, take all," is also allowed to persist, and/or the conduct is repeatedly ratified due to the absence of discipline, threat of discipline, or reprimand of the offending social workers and/or their supervisors.

C)   A policy and/or unwritten practice or custom of threatening parents/guardians to enter into what COUNTY calls "Safety Plans," wherein in the parent(s) are threatened that if they

will not agree to terms which include, but are not limited to such onerous and constitutionally

violative conditions as,

> i) separating the parent(s) from their child[ren] by placing them with someone else,

> ii) separating from their spouse or significant other,

> iii) forbidding any contact whatsoever with the child[ren]'s other parent or COUNTY perceived perpetrator of abuse/neglect as to the child[ren],

> iii) moving from their home and/or spouse/significant others home, inclusive of the concomitant reality of on occasion then requiring the parent(s) to lose their job and job-related benefits, as happened to Taylor as part of the events and circumstances described herein,

> iv) filing sworn documents containing false and misleading claims against the other parent, or others, within State courts in order to comply with COUNTY demands effecting violations of rights of familial association,

one or all of which terms and conditions the parent(s) are told by COUNTY through its social workers if not agreed to, will result in the removal of the parent(s) child[ren] from their care, custody, and control, and the child[ren] are in fact removed unlawfully repeatedly by COUNTY when they refuse to "cooperate" and/or enthusiastically agree with anything CSA social workers want or demand of the parents.

D) A policy of holding "Team Decision Meetings" wherein legal counsel are not allowed to attend with their parent-clients despite no lawful authority to exclude legal counsel, and parents find themselves in a room with social workers who frequently already have possession of their child[ren], and/or are threatening removal of their child[ren], and use the opportunity to question parents without legal counsel present and ascertain facts in what is an

Complaint
Webb, et al. v. County of Stanislaus, et al.
U.S. District Court – Eastern District of California
Case No.

investigative process, and then through coercion and intimidation obtain illegitimate "consent" from parent(s) to engage in actions (euphemistically often referred to as "services") or to do things or not do things as the parent(s) would otherwise have the right to do or not do but for the explicit and/or implicit threat of the continued deprivation or loss of their children for failing to comply with COUNTY/CSA's demands.

25.    This menacing and coercive abuse of power by these COUNTY agents is undertaken against parents repeatedly and routinely in the County of Stanislaus in the absence of circumstances in an investigation of a referral for child abuse or neglect that amount to imminent risk of serious bodily injury to a child such that removal or interference with the parent-child relationship can be undertaken lawfully unless the social worker(s) obtain a warrant, and yet this conduct is engaged in repeatedly when there is sufficient time within which to attempt to obtain a warrant.

26.    PLAINTIFFS allege the COUNTY has no training and/or at best constitutionally inadequate training with regard to all of the following areas of law and issues that arise routinely in the context of any child abuse and/or neglect investigation on a daily basis in the County of Stanislaus;

A) the scope, nature, and importance of the 4th and 14th Amendment based rights protecting familial association, including but not limited to,

    i) the procedural due process right to have notice and the opportunity to be heard by a neutral and detached judicial officer before the removal of a child from a parent's care in the absence of narrowly circumscribed exceptions to that requirement based on circumstances constituting learned in the investigation of abuse/neglect of an imminent risk of serious bodily injury, and,

ii) the constitutional rights and liberty interests of a parent to care for his/her child without unreasonable government interference, and the reciprocal rights of a child to same, and,

iii) the existence and relevance of federal laws and precedent on the removal of children from their parents/guardians in the context of an investigation of a child abuse or neglect referral, and,

B)  the nature and extent of the physical, emotional, and psychological harm that removal of children causes the parents and the children, including but not limited to,

i) the permanent and untreatable emotional and physiological damage to children and life-long sequalae of emotional and psychological instability of children separated from their parent(s), and,

ii)  the nature of the aforementioned damage as being physically measurable in regard to physical changes in children's developing brains as seen in the impairment of neurons and neurological receptor conductivity, and diminished growth of both grey and white matter in their brain,

iii) the importance of the parent-child bond that is disrupted by removal and/or separation from parent(s), to the long term behavioral, emotional, and psychological function of [a/the] child[ren] passing through infancy, youth, adolescence and adult hood, and inclusive but not limited to the effect of the child[ren]'s ability to form lasting emotional bonds with friends, family, lovers and spouses, in addition to the panoply of individuals encountered in a lifetime such as teachers, and coaches, pastors, and mentors, for whom children damaged in the way complained of above, cannot learn and grow and achieve their highest and best

Complaint
Webb, et al. v. County of Stanislaus, et al.
U.S. District Court – Eastern District of California
Case No.

human achievement because they cannot achieve any semblance of an intimate

emotional bond with those individuals, and,

iv) the depths of depression, despair, anxiety, anger, and grief visited upon parents

of child[ren] removed by COUNTY and the long term effects of that experience on

their ability to function emotionally and psychologically, to trust government

authority, and to feel safe and secure in their homes and families.

**COUNTY OF STANISLAUS DEFENDANT SOCIAL WORKERS**

27.     Defendant PATRICIA TOUT ("TOUT"), whose acts as alleged herein were

performed under color of state law, was at all times material hereto, upon PLAINTIFFS'

information and belief, a CSA "Manager III," with supervisory authority over COBBS and

JONES, employed by COUNTY.

28.     Defendant ERIC ANDERSON ("ANDERSON"), whose acts as alleged herein were

performed under color of state law, was at all times material hereto, upon PLAINTIFFS'

information and belief, the supervisor of COBBS and JONES, and employed by COUNTY.

29.     Defendant APRIL COBBS ("COBBS"), whose acts as alleged herein were

performed under color of state law, was at all times material hereto, upon PLAINTIFFS'

information and belief, a CSA emergency response social worker supervisor employed by

COUNTY.

30.     Defendant LAWRENCE JONES ("JONES") whose acts as alleged herein were

performed under color of state law, was at all times material hereto, upon PLAINTIFFS'

information and belief, a CSA emergency response social worker employed by COUNTY.

31.     PLAINTIFFS are informed and believe that ANDERSON was the supervisor to

COBBS and JONES, and ANDERSON either integrally participated in every decision made

with regard to the removal of A.W.; the use of the possession of A.W. as leverage against Taylor Webb to violate her and Jeremy Westfall's familial association rights (the "Safety Plan" demand). However given her seniority, COBBS was the supervisor to JONES, and the supervisor whom JONES conferred with during her "investigation" of the matter of removing A.W. from her father Jeremy and mother Taylor, though PLAINTIFF's allege in the alternative that COBBS was actually an integral participant in the decision to remove A.W. and/or the actual physical removal of the infant on October 31st, 2019, and allege COBBS did if nothing else in this instance and in furtherance of the policies of COUNTY, ratify, agree with, and/or determined and demanded, the actions and inactions of JONES complained of herein.

32.     PLAINTIFFS are informed and believe and, based upon such information and belief, allege that, at all times herein mentioned, each and every defendant-employee of the COUNTY was the agent and/or employee of their co-defendants, and was acting either in their individual capacity or in the scope, purpose and authority of COUNTY, and/or in their employment or agency with said entities, and with the knowledge, permission, ratification, and/or consent of said co-defendants and/or entities.

33.     PLAINTIFFS are informed and believe, and thereon allege, that each of the named individual defendants hereinabove, did knowingly and willingly, with a common intent and scheme set forth in further detail herein below, conspire with the City of Modesto Defendants set forth below to plan and execute the unlawful removal of A.W. from her parents' care, custody, and control on October 31st, 2019, in an effort to injure PLAINTIFFS and deprive them of their rights, liberties, and interests, as such rights are afforded under the United States

Constitution and the California State Constitution, and conspired generally to damage PLAINTIFFS and inflict great injury upon them.

**CITY OF MODESTO**

34.    Defendant CITY OF MODESTO ("MODESTO") is a municipality in corporate form, organized and existing under the laws of the State of California, and has as an administrative subunit thereof called the MODESTO POLICE DEPARTMENT (hereinafter "MPD"), both of which, and any administrative or executive subunits thereof, will be collectively referred to herein as CITY.

35.    CITY has in its employment various police officers, such as DOE 1 and DOE 2, the individually named Defendants herein, who by virtue of their employment are state actors within the meaning of that term in the jurisprudence of civil rights legislation embodied in 42 U.S.C. 1983.

36.    CITY promulgated, encouraged, and/or permitted, the policies, patterns, and practices under which the individual defendants, and DOES 1 – 10, committed the acts or omissions complained of herein; and condoned, ratified, and encouraged the conduct of the CITY employee-defendants, as complained of herein, or failed to train, or inadequately trained the CITY employee-defendants in a manner intended to legitimately avoid the recurring violation of parent(s) and children(s) constitutional rights.

37.    As the employer of police officers such as DOE 1 and DOE 2, CITY had primary responsibility for the training, education, and supervision of police officers, including not yet determined supervisors of such employees, and PLAINTIFFS are informed and believe and thereon allege that it was CITY which promulgated, encouraged, administered, and/or permitted the policies, practices, customs, and procedures under which, and as the moving

13

force of which, the individual defendant employees of CITY committed the acts or omissions and constitutional violations complained of herein.

38.    Though not specified separately as a Claim for Relief in the heading herein below, PLAINTIFFS contend and allege the CITY is liable for the violations claimed in PLAINTIFFS' First, Second, and Third Claims for Relief in this Complaint (14th Amendment – Removal), and all damages foreseeably flowing therefrom, by virtue of the law of *Monell v. Department of Social Services*, 436 U.S. 658 (1978), and its progeny.

39.    PLAINTIFFS allege that the CITY has policies, practices, and/or customs which contain the following features in their modus operandi – features that are constitutionally violative of parents' and children's rights on their face and yet perpetuated and pursued with deliberate indifference to the rights and safety of PLAINTIFFS herein, and families such as PLAINTIFFS' within Stanislaus CITY.  Such policies, practices, and customs are as follows;

A)  A policy of integrally participating in the removal of children from their parents or guardians without a warrant, consent, or imminent risk of serious bodily injury to [a] child[ren], taking [a] child[ren] when there is sufficient time to obtain a warrant and there are less intrusive means of protecting the child[ren] from whatever the alleged or perceived risk of serious bodily injury to the child[ren] might be, without any independent investigation whatsoever, but rather, merely because COUNTY social workers ask the police officers to assist them in removing child[ren] from their parent(s), as described to have occurred in this Complaint.

B)  A policy and/or unwritten practice or custom of integrally participating in the removal of sibling[s] of children who are targeted for removal and/or are removed from their home, parents, or lawful guardians by COUNTY social workers, again without any independent

14

investigation, and when there has not been so much as an "allegation" of abuse or neglect of

the sibling[s], regardless of the absence of any imminent risk of serious bodily injury to

[a/the] child[ren], taking [a/the] child[ren] when there is sufficient time to obtain a warrant

and there are less intrusive means of protecting the child[ren] from whatever the alleged

and/or perceived risk of serious bodily injury to the child[ren] might be.

40.      PLAINTIFFS allege the CITY has no training and/or at best constitutionally

inadequate training, with regard to all of the following areas of law and issues that arise

routinely in the context of any child abuse and/or neglect investigation or request by

COUNTY to integrally participate in the removal of children on a daily basis in the County of

Stanislaus;

A) the scope, nature, and importance of the 4th and 14th Amendment based rights protecting

familial association, including but not limited to,

> i) the procedural due process right to have notice and the opportunity to be heard by
>
> a neutral and detached judicial officer before the removal of a child from a parent's
>
> care in the absence of narrowly circumscribed exceptions to that requirement based
>
> on circumstances constituting learned in the investigation of abuse/neglect of an
>
> imminent risk of serious bodily injury, and,
>
> ii) the constitutional rights and liberty interests of a parent to care for his/her child
>
> without unreasonable government interference, and the reciprocal rights of a child
>
> to same, and,
>
> iii) the existence and relevance of federal laws and precedent on the removal of
>
> children from their parents/guardians in the context of an investigation of a child
>
> abuse or neglect referral, and,

Complaint
Webb, et al. v. County of Stanislaus, et al.
U.S. District Court – Eastern District of California
Case No.

B) the nature and extent of the physical, emotional, and psychological harm that removal of children causes the parents and the children, including but not limited to,

i) the permanent and untreatable emotional and physiological damage to children and life-long sequalae of emotional and psychological instability of children separated from their parent(s), and,

ii) the nature of the aforementioned damage as being physically measurable in regard to physical changes in children's developing brains as seen in the impairment of neurons and neurological receptor conductivity and diminished growth of both grey and white matter,

iii) the importance of the parent-child bond that is disrupted by removal and/or separation from parent(s), to the long term behavioral, emotional, and psychological function of [a/the] child[ren] passing through infancy, youth, adolescence and adult hood, and inclusive but not limited to the effect of the child[ren]'s ability to form lasting emotional bonds with friends, family, lovers and spouses, in addition to the panoply of individuals encountered in a lifetime such as teachers, coaches, pastors, and mentors, for whom children damaged in the way complained of above cannot learn and grow and achieve their highest and best human achievement because they cannot achieve any semblance of an intimate emotional bond with those individuals, and,

iv) the depths of depression, despair, anxiety, anger, and grief visited upon parents of child[ren] removed by CITY, and the long term effects of that experience on their ability to function emotionally and psychologically, to trust government authority, and to feel safe and secure in their homes and families.

16

**CITY OF MODESTO DEFENDANT POLICE OFFICERS**

41.     Defendant DOE 1 ("DOE 1"), whose acts as alleged herein were performed under color of state law, was at all times material hereto, upon PLAINTIFFS information and belief, a sworn police officer employed by CITY.

42.     Defendant DOE 2 ("DOE 2") whose acts as alleged herein were performed under color of state law, was at all times material hereto, upon PLAINTIFFS information and belief, a sworn police officer employed by CITY.

43.     PLAINTIFFS are informed and believe and, based upon such information and belief, allege that, at all times herein mentioned, each and every defendant-employee of the CITY was the agent and/or employee of their co-defendant police officers and/or social workers, and was acting either in their individual capacity or in the scope, purpose and authority of CITY, and/or in their employment or agency with said individuals and entities, and with the knowledge, permission, ratification, and/or consent of said co-defendants and/or entities.

44.     PLAINTIFFS are informed and believe, and thereupon allege, that the two DOE individual police officer defendants hereinabove, did knowingly and willingly, with a common intent and scheme set forth in further detail herein below, conspire with the COUNTY Defendants set forth above to plan and execute the unlawful removal of A.W. from her parents' care, custody, and control on October 31st, 2019, in an effort to injure PLAINTIFFS and deprive them of their rights, liberties, and interests, as such rights are afforded under the United States Constitution and the California State Constitution, and conspired generally to damage PLAINTIFFS and inflict great injury upon them.

//

//

Complaint
Webb, et al. v. County of Stanislaus, et al.
U.S. District Court – Eastern District of California
Case No.

**OTHER INVOLVED PERSONS AND TERMS**

45.        Other persons relevant to the facts to be discussed include Frank Westfall, Jeremy's father, Melinda Westfall, Jeremy's step-mother, Paula Webb, Taylor's mother, "Holly," Taylor's sister, and "Kimi," Taylor's sister.

46.        The "TDM" occurring November 1st, 2019, as discussed below, stands for "Team Decision Meeting."  This is a meeting held by COUNTY with parents and sometimes other family members or support persons in a room with social workers and often social worker supervisors or "managers" such as TOUT.

47.        The TDM name has changed, and it is currently referred to as a "Child and Family Team" meeting, or "CFT."  It is handled the same as a TDM regardless.

48.        COUNTY will not allow parents to bring attorneys to these TDM meetings, who might recognize the COUNTY employees' threats and abuse of power as violations of State and/or Federal Law, giving the COUNTY employees free reign to engage in threatening and coercive tactics – such as happened during the TDM described herein below.

49.        COUNTY uses these TDMs as fact gathering sessions during a time while contemplating intervention into the family's associational rights, be it demanding they undertake some form of counseling, classes, obtain medical services, and a myriad of other services which are tied to federal funding requests the following year based on the number of "services" utilized, and one option available when they have not already taken the parents' child[ren], is threatening to to remove their child[ren]/

50.        In this instance, and in countless instances every year within the County of Stanislaus, COUNTY/CSA conducts these TDMs when they have already unlawfully taken parent(s)' minor child[ren].

51.     In such instances where they have already taken a parent(s) child[ren], they use their possession of the parent(s) child[ren] as leverage to extract concessions to various courses of action or cessation of courses of action by the parents in exchange for returning their child[ren] or placing the children at least with a relative, rather than placing their child[ren] in foster care.

52.     There exists absolutely no provision of law that allows COUNTY/CSA to exclude parent(s) attorneys from such meetings, yet it is always the case that attorneys representing the parent(s) are not allowed to attend.

53.     A term also used herein, is "Safety Plan." The actual form that COUNTY/CSA uses is titled an "Action Plan," but the social workers of CSA themselves most commonly refer to the process as "developing a safety plan," and the final written product on a form titled "Action Plan," still as a "Safety Plan."

54.     The Safety Plan is a handwritten document intended to memorialize alleged agreed upon steps/tasks for the various participants – including the parent(s) – to take, what concerns justified the steps/tasks the various participants are to undertake, and spells out the "resolution" reached between the parties, whatever resolution that may be (continued detention of the child, removal of a child, return of a child, placement of a child with a relative or extended family member).

55.     However, the "consent" of the parent(s), as with Taylor in this instance, is often coerced, accompanied by threats, and parent(s) are not free to object and demand their children be returned, as that will constitute an unwritten but widely recognized phenomenon of "contempt of social worker."

56.     It is a phenomenon that constitutes a practice and custom of COUNTY and its CSA social workers; if you as a parent challenge anything that a CSA social worker does or says, then they will increase their efforts, without reference to any moral or legal limits, to take the parent(s) children from them, thereby exacting retribution by such removal and separation of children from the parent(s) for parents having the daring and audacity to challenge the CSA social workers sense of omnipotence and superior knowledge and intellect.

### III

### BACKGROUND & COMMON FACTS

**FEBRUARY OF 2019 – JEREMY'S DAUGHTER K.W. PASSES**

57.     On February 27th, 2019, in the morning hours, exact point unknown, Jeremy's oldest child K.W. passed away in her sleep from her five (5) year battle with MSP3 Sanfilippo Syndrome.  She was age 10.  K.W. was five (5) years old when the symptoms of her illness manifested, and Jeremy learned then, with Taylor by his side, that K.W.'s disease was rare, incurable, and she would not be expected to live into adulthood.

58.     On the morning of February 27th, 2019, Jeremy went to wake K.W. for school, only to find her cool expired body in her little bed; neighbors have described the anguished cries of Jeremy Westfall coming from that home that morning as the most haunting and gut wrenching memory they could ever have.

59.     That same day, social workers from the COUNTY removed Jeremy's other child B.W., as in the case of A.W., without a warrant nor any circumstances constituting an imminent risk of serious bodily injury.

60.     The removal of B.W. is another incident illustrative of the customs and practices of the COUNTY and their non-existent or insufficient training.

61.     In fact, social workers forced Jeremy to sign a "Safety Plan" under threat of removing B.W. This was just as described below with regard to Taylor and A.W., with the slight difference that COUNTY/CSA had already unlawfully removed A.W. when Taylor was forced to sign a "Safety Plan" and Jeremy was forced to agree to not contest Taylor filing family law papers to strip him of any legal rights to his newborn daughter.

62.     In this instance with B.W. in February of 2019, not an hour or two after Jeremy signing the "Safety Plan" which specified B.W. would stay at Jeremy's father's home rather than be taken into foster care, social workers went to B.W.'s school and took him into custody, and put him in foster care.

63.     This is another instance where the *Monell* practices of COUNTY's forced "consent" to "Safety Plan" upon threat of the unlawful removal of a child occurred, as they do routinely.

64.     This commenced a juvenile dependency proceeding against Jeremy, which was still proceeding in October of 2019 when A.W. was born, despite the fact B.W. has never had a single injury of any kind leading to a referral for abuse or neglect in the care of his father; not one.

65.     By October of 2019, Jeremy was visiting with his son B.W. in two four-hour blocks per week, and he was not supervised by anyone during that time.

66.     An autopsy of K.W. confirmed she passed away from the Sanfilippo Syndrome from which she suffered, an illness that is always fatal and very few even survive to adulthood.

67.     All during the dependency proceedings to the date of A.W.'s removal, Jeremy was also continuing to visit with his son G.W., a severely autistic child. These visits took place at any time he so desired, in agreement with Jeremy's paternal aunt and uncle who had cared for G.W. since before he was one (1) year of age.

68.     ANDERSON, COBBS and JONES knew all about the foregoing circumstances commencing with paragraph 54.

69.     They knew about the juvenile case involving Jeremy and B.W., and in fact had accessed the entire file.

70.     They knew about the passing of K.W. and the confirmatory autopsy report which indicated K.W. died of her Sanfilippo Syndrome disease. They knew about the visitation status of Jeremy with his sons B.W. and G.W.

71.     They knew all of the foregoing before their removal of A.W. on October 31st, 2019.

72.     The seizure and removal of A.W. from her parents' care on October 31st, 2019 was undertaken without either parent's consent.

73.     The seizure and removal of A.W. from her parents' care on October 31st, 2019 was undertaken without probable cause.

74.     The seizure and removal of A.W. from her parents' care on October 31st, 2019 was undertaken without circumstances constituting an imminent risk to A.W. of serious bodily injury, and with more than sufficient time to obtain a warrant if in fact there had been probable cause to take protective custody of A.W., which there was not.

75.     There existed no risk of injury of any kind to A.W. on October, 31st, 2019, such that there was not sufficient time within which to procure a protective custody warrant and lawfully seize and remove A.W.

76.     COUNTY/CSA does not know and/or does not care about the rights of parents and children to live together without unnecessary government interference.

**OCTOBER 2019 REMOVAL OF A.W.**

77.     Taylor's pregnancy had been good, normal, and mostly uneventful, however, when

Complaint
Webb, et al. v. County of Stanislaus, et al.
U.S. District Court – Eastern District of California
Case No.

the time came for Taylor to go into labor a long and arduous delivery began.

78.  Taylor had dutifully complied with her prenatal course of care and stopped all drinking or occasional use of marijuana during her pregnancy.

79.  Taylor was originally expected to give birth to her first child, and Jeremy's fourth child, a daughter to be named A.W., on October 19th, 2019.

80.  The birth, and all pre-birth maternity related healthcare Taylor had received, occurred at Sutter Health Memorial Medical Center in Modesto, Ca., which will simply be referred to from hereon as "hospital."

81.  Despite the predicted date of birth, Taylor did not go into labor until October 23rd, 2019, at which time she went and was admitted to the hospital.

82.  Taylor's water had not broken at that point. Upon admission she was administered Pitocin, a drug designed to induce labor.

83.  Also occurring during this initial visit, Taylor was administered intravenous medications to address toxemia and/or symptoms of preeclampsia.

84.  Twelve hours later, her labor had not progressed. She was sent home on the 24th of October, where she stayed for one whole day. Taylor returned to the hospital on the 25th of October.

85.  Taylor presented to the hospital on the 25th of October not because of an intention to be admitted for the birth, rather she was at the hospital for a previously scheduled weekly checkup routine to approaching a due date for birth.

86.  Taylor presented that day with what medical personnel felt to be excessive swelling in her legs and her blood pressure was very high. Taylor was admitted, and the hospital staff again administered Pitocin.

87.     On this admission, a Dr. Pont ended up manually breaking Taylor's water.

88.     Taylor's labor started to progress. However, she seemed "stuck" at a point of eight (8) centimeters of dilation for several hours, and thus consideration of a C-Section came up with the doctor and staff.

89.     At that point, Dr. Pont felt and explained that there were several requirements medically that had to occur before they would do a C-Section, so Taylor had to wait.

90.     Once the requirements were met, it was time for Taylor to have a C-Section on October 27th, 2019.

91.     A.W. was born happy and healthy on ████ ███ 2019, at around 8 a.m.

92.     Jeremy was present at the birth. Jeremy held Taylor's hand throughout the entire C-Section.

93.     Jeremy was there in the hospital all but possibly one and one-half days of the entire period that Taylor was at the hospital during the period from the 23rd of October until A.W.'s birth.

94.     However, Jeremy was not at the hospital on the date of the events and circumstances, described below, in which his daughter's care, custody, and control was wrested from him unlawfully - simultaneously as it was wrested from Taylor - on October 31st.

95.     Taylor's mother Paula Webb, who resides in Clinton, Utah, arrived at the hospital the same day as A.W. was born, after the child's birth. Jeremy was present in the room the majority of the time that Paula was there until the re-admission of Taylor on November 2nd, described below. Everything was absolutely fine in terms of the manner in which they were communicating, laughing, and conversing; that would all change after the Team Decision Meeting ("TDM") on November 1st, 2019, to be described.

24

96.     Around 11 a.m. on October 31st, 2019, the day Taylor was to be discharged, social workers COBBS and JONES came into the hospital room.  On this first appearance they were unaccompanied by anyone else.  When they introduced themselves as social workers, COBBS said that they were there due to a "concern" about A.W.'s safety, and they wanted to discuss a "Safety Plan" for A.W.  Taylor replied, "[A "Safety Plan"] [i]n regards to what?"

97.     COBBS responded, "Jeremy's history."

98.     Taylor responded saying, "I am going to videotape this conversation."

99.     When Taylor indicated she wished to videotape their conversation it visibly angered COBBS.

100.    COBBS told Taylor, "You don't have a right to videotape us."

101.    Taylor then said, "Well then I want a lawyer present."

102.    In response to Taylor indicating she wanted an attorney present COBB said, "You don't need a lawyer, let's just discuss a 'Safety Plan' and go from there."

103.    Taylor then asked her what exactly her concerns were, and COBBS said, "We are concerned about A.W. being in the same household with you and Jeremy."

104.    At that point, JONES started talking very briefly to Paula, and then gave her a nod of the head towards the door. He and Paula exited the room and started talking outside the room for approximately five (5) to ten (10) minutes.

105.    JONES and Paula then came back into the room where Taylor lay with A.W. in her arms.

106.    Paula came back in saying to Taylor that she had agreed with JONES to do a drug test so that A.W. could go into Paula's "temporary custody."

107.	Taylor told Paula that she was not going to do that and did not need to do any drug test because Taylor was getting a lawyer.

108.	Taylor told Paula – right in front of COBBS and JONES - that she did not trust CPS because of what they put her and Jeremy through with K.W. and B.W.'s case.

109.	Taylor also insisted to see some paperwork, some court orders or warrants, that gave the social workers legal authority to be making demands of her separating from Jeremy.

110.	COBBS told Taylor that they did not have to show her any paperwork.

111.	JONES then began telling Taylor what her "options" were.

112.	JONES told Taylor she had the "option" to either stay where she was in her and Jeremy's house and have Jeremy move out, or, she had the "option" to go to one of her sister's houses.

113.	Taylor told him that neither sister was an option because they have children, and CPS was corrupt and might go after her sister's kids.

114.	JONES continued with his dissertation on how things were going to go, the arrogance of his words matched only by the arrogance of his entire demeanor.

115.	JONES told Taylor that, "If we don't come up with a plan and an agreement, A.W. will be taken and placed in foster care, and if she goes into foster care, you will never see her again!"

116.	Taylor asked them pleadingly, "What is it you have against me?  I do not have a criminal background I do not have anything?"

117.	To that COBBS repeated it was because of "their" concerns of Taylor living with and around Jeremy with A.W.

118.     Then Taylor asked them in frustration, how they expected her to make a decision right then and there without time to think about it, and maybe figure out if she could rent her own room somewhere.  Taylor told them their demands for such a significant decision made without time for reflection was unrealistic.

119.     Neither COBBS nor JONES really responded to Taylor's comments directly, but seemed to mumble something about understanding that point, got up, and left the room.

120.     While COBBS and JONES were outside the hospital room they called ANDERSON, who told them that if Taylor would not agree to move away or otherwise separate from Jeremy, they were to take A.W. from her.

121.     COBBS's attitude and demeanor became increasingly hostile during the entire event, to a point where before she left the room the first time she was being very loud, very aggressive, and pointedly rude.

122.     COBBS would angrily gesticulate at Taylor while talking to her, especially when Taylor reiterated that she was not "stupid," when she had asked for a lawyer, and when she had asked for some paperwork authorizing the social workers to be taking A.W. from her care.

123.     JONES was not as bad, but his entire presentation was like COBBS, of a nature to convey that he and COBBS were going to take A.W. from Taylor unless she cooperated fully with any and every of their demands.

124.     When the two left the room Taylor immediately called Jeremy and told him what was going on as quickly as she could.

Complaint
Webb, et al. v. County of Stanislaus, et al.
U.S. District Court – Eastern District of California
Case No.

125.    Immediately after that brief call Taylor called Melynda Westfall, telling her to please come immediately as there were two CSA social workers in her room harassing her.  Melynda hung up and immediately drove to the hospital.

126.    While the social workers were absent, Paula began saying that Taylor was being "ridiculous" by not allowing Paula to take a drug test.  Taylor was telling her that she was not being ridiculous, because CPS is a joke.

127.    Paula stated more than once, "I understand where you are coming from."

128.    Between the time the social workers exited the room and law enforcement came in with them again a bit later, as will be explained shortly, Melynda arrived at the hospital.  She saw the social workers conversing in the hallway outside of the room but did not engage with them and went directly into Taylor's hospital room.

129.    Melynda, Paula, and Taylor were present when all of the following facts and circumstances occurred in Taylor and A.W.'s hospital room on October 31st, 2019.

130.    Not long after the social workers exited the room the first time, a nurse came into Taylor and A.W.'s room and asked to take the baby so she could be weighed.

131.    Suspicious of the request – because the child had already been weighed a couple of times and was by the doctor and staff's own words doing just fine - Taylor told the nurse the child was not going anywhere without her, her mother, or Melynda.

132.    The nurse acknowledged Taylor's statements, and left the room.

133.    Another two (2) to three (3) minutes passed, and the aforementioned nurse, a nurse that Taylor understood as being the "head nurse," and an additional male, who was an apparent hospital staff member, entered the room.

134.     They were accompanied by COBBS and JONES, and now two Modesto police officers Plaintiffs will designate as DOE 1 and DOE 2.

135.     Immediately noticeable, was that the police officers had already put on latex gloves, which sent the message to Taylor, without words, that they were there for the purposes of taking her baby.

136.     The officers were in full uniform, wearing bullet proof vests and full duty belts containing all the typical law enforcement tools of violence, from lethal hand guns to less-lethal weapons, such as tasers and pepper spray/mace.

137.     The social workers had been out of the room somewhere between fifteen (15) and thirty (30) minutes total before this entourage of government actors engaging in the abuse of their lawful authority entered A.W. and Taylor's hospital room.

## THE REMOVAL OF NEWBORN A.W. FROM HER MOTHER

138.     This time, upon entry into the room, COBBS and DOE 1 almost simultaneously announced that they were there to remove A.W.

139.     COBBS continued, saying that, "Because you refused to cooperate, we are taking A.W."

140.     COBBS was referring to Taylor's "refusal," described hereinabove, to give them an answer about her preferred living arrangements within the very few minutes of their initial conversation in the room with just COBB and JONES there as government actors.

141.     Again Taylor, now more emphatically than the time when the social workers were initially in the room, began asking COBBS, JONES, and now DOE 1 and DOE 2, "Where is your warrant to take my baby? I want to see the warrant(!)," she said again, "Where is your written warrant saying you are able to remove her from my care."

29

142.     Like COBBS had said previously, she replied, "We don't have to show you any documentation."

143.     COBBS said they did not need a warrant. She said such lack of need was due to "exigent circumstances," though she mispronounced it approximately four times, "we can take A.W."

144.     Melynda then turned to DOE 1 and asked if COBBS statement was, "true and legal."

145.     DOE 1 responded saying, "Once we are dispatched to assist a warrant is not needed and the baby must be released to CPS."

146.     Then Paula said, "Don't create any more problems for yourself, just let them take her," and Taylor, surrounded by armed police officers and the two social workers allowed her mother to remove from her arms and she handed A.W. to the police officers or one of the social workers.

147.     Taylor, through her mounting tears, tried to hand the police officers a bag of breast milk that she had pumped. They said, "We can't take it." Taylor responded that it is important for A.W.'s health, and DOE 2 reluctantly took the bag from Taylor.

148.     The officers and the social workers turned and walked out of the room with A.W., but not before they left business cards with Melynda, and told her that there was going to be a TDM at 10:00 a.m. the following day at the "Family Services Center" on Hackett Rd., and that both she and Paula could attend.

149.     COBBS also told them that there was a court date set for November 5th, 2019 at 8:30 a.m. They then left the hospital room.

Complaint
Webb, et al. v. County of Stanislaus, et al.
U.S. District Court – Eastern District of California
Case No.

150.    With that, Taylor began crying non-stop, sobbing and wailing as she had never experienced previously in her life; Taylor would later describe her tears as "waterfalls" coming out of her eyes.

151.    Taylor cried out loud, "What did I do to deserve this!  That's my baby."

152.    Taylor was sobbing uncontrollably for approximately twenty (20) minutes before her tears began to subside.  Taylor left the hospital that day in a massive state of depression, her body still aching from the C-Section that released the child the government actors had just removed from her without lawful justification.

153.    Upon leaving the hospital, Paula and Taylor went to the home of Jeremy's parents, Frank and Melynda Westfall.  Present in the home upon Taylor and Paula's arrival, were Melynda, Frank, Jeremy, B.W. a minor age five (5) at the time, and Frank & Melynda's two children.

154.    The adult family members put the children to activities in another room and sat discussing what had just occurred. They shared their mutual disbelief at the fact CSA social workers and police had taken A.W. from Taylor based on claimed "concerns" about Jeremy, whose last conviction of any kind related to violence was in 2013, over six (6) years prior and involved verbal threats only, and the last conviction related to domestic violence was in 2008, over eleven (11) years prior.

155.    Paula and Taylor both left the Westfall home after approximately one to one and one-half (1 – 1 ½) hours and returned to the home shared by Taylor and Jeremy. Shortly after they arrived, Paula got back in her car (she had driven from Utah), and went out and got food for Taylor and herself.  She also obtained prescription medication for Taylor while she was out.

156.     By the time Paula and Taylor had arrived at the home Taylor was weak and in severe emotional depression, yet still had to explain and go through all that had happened to her in the hospital that day with the CSA social workers and members of the Modesto Police Department, with Jeremy.

157.     After approximately three (3) hours or so from the arrival of Paula and Taylor, Taylor was physically and emotionally drained, and went to sleep.

158.     Jeremy and Taylor lay together in their bed, both crying and trying to console each other until they fell asleep.

**CALL TO JORGE & SALISHA CRESPO**

159.     Early in the morning on November 1st, 2019, Taylor made a call to friends of the Westfall family that she had met and befriended through her over five (5) year relationship with Jeremy.

160.     The friends' names are Jorge and Salisha Crespo.

161.     Jorge and Salisha were already approved foster care providers, and in fact, they had placement of numerous foster care children in their care over the years.

162.     Taylor called saying, "CPS is trying to take A.W. away from me. Can A.W. and I stay with you in Fort Bragg until we figure this out with CPS? I do not want to go to my mom's."

163.     Salisha responded saying, "As always my house is yours whenever you need it for you and Audrey. And if I need to ensure Jeremy doesn't come over trust and believe that will be the case. There is no need for you to go all the way to your Mom's in Utah if you don't want to. Just remember you have options."

//

**DISCUSSIONS WITH "MEDIATOR" BEFORE TDM BEGINS**

164.    On the morning of November 1st, Paula, Melynda, and Taylor, drove together and attended the TDM at the CSA offices on Hackett Rd.

165.    Before the TDM, earlier in the morning, COBBS had called both Taylor and Paula separately to make sure they were coming to the meeting.

166.    After waiting in the lobby for fifteen (15) to twenty (20) minutes, another COUNTY social worker named Howard Courney came out to the lobby and introduced himself.

167.    He indicated he would be the "mediator" or "facilitator" of the meeting; he was in fact in the meeting taking on those tasks the duration of its time.

168.    PLAINTIFFS have no information at this time on any role played by Howard Courney in the meetings, discussions, or decisions of the social workers TOUT, COBBS, or JONES, that proceeded the TDM; PLAINTIFFS have not named Mr. Courney as a defendant based on the following facts regarding communications with him prior to the TDM and his apparent primary role and tasks vis-à-vis the actual TDM that was held.

169.    After introducing himself as the "mediator" or "facilitator," Mr. Courney then told the three women, "They [the social workers] want to hear what your (Taylor) safety plan is for Audrey, how you will adhere to it and maybe, if they like your plan, they will agree to let Audrey come back in your possession."

170.    Mr. Courney continued, "They do not want to hear anything about 'the accusations aren't true,' 'those things didn't occur,' 'he's a good guy,' none of that. They don't want to hear that at all. If a plan to their liking does not happen, Audrey will be a part of the CPS system. Do you understand?"

Complaint
Webb, et al. v. County of Stanislaus, et al.
U.S. District Court – Eastern District of California
Case No.

171.     Though in utter shock at the description of the meeting they were about to attend consisting of COUNTY employees acting as jury, judge, and executioner, and having to appease them in order to avoid A.W. being removed and put in the "CPS system," all of the women acknowledged that they understood.

172.     Once more, about five (5) minutes before the meeting actually started, Mr. Courney came out again and briefly said pretty much the same thing in abbreviated fashion, "This is what they want to hear: how you plan to protect Audrey, how you plan to follow through so you can get your daughter and keep her out of CPS. Do you understand?"

173.     Again, the women indicated they understood what he was saying.

**THE TDM BEGINS**

174.     Most talking in this meeting on behalf of COUNTY/CSA was handled by TOUT.

175.      Behind her in the amount of talking on behalf of COUNTY was JONES, but COBBS spoke up nearly as much.

176.      The meeting started with TOUT, as augmented from time to time by JONES and/or COBBS, telling Taylor "they" were worried for Audrey's safety around Jeremy and that Taylor seems to be "easily influenced" by Jeremy.

177.     When asked where this "easily influenced" claim was coming from, never mind the fact it is meaningless in the abstract, COBB said it came from the fact that in the hospital the day prior, after Taylor speaking to Jeremy, Taylor's demeanor changed and she was not cooperating with them.

178.      Taylor somewhat agreed her demeanor changed, but she said someone's demeanor is likely to change like hers did, when you march into their hospital room threatening you are going to take their child and you then give them seconds to decide the next steps of their life!

179.    Taylor pointed out that included where she would live, who she would live with, and how she would get by, or else they would take her newborn child!

180.    COBBS then told Taylor, "Our concerns are that Jeremy gets easily upset and yells and yelling is domestic violence."

181.    "Yelling" is not domestic violence.

182.    "Yelling" does not ever cause imminent serious risk of bodily injury.

183.    Ironically, despite this claim of some "inappropriate influence" Jeremy had over Taylor, with which he so "easily influenced" her, the social workers told Taylor that they were not prohibiting Taylor from being around or with Jeremy, just that she could not allow A.W. to be around or with Jeremy.

184.    TOUT and the other two social workers also brought up K.W.'s death, speaking of it in the false narrative of K.W.'s death CSA had maintained since their involvement in Jeremy's life in early 2019.

185.    COBBS said that the night K.W. passed, "Jeremy & Taylor had a fight and that K.W. was left unattended and not checked on for twelve (12) hours."

186.    All of the women disputed that claim, especially Taylor.

187.    Taylor told them there had been no fight of any kind the night before K.W. passed away, not an argument, a disagreement, anything.

188.    Taylor told them she herself had been in K.W.'s room that very morning at approximately 5:30 a.m. to retrieve some work clothes from the closet in that room and had seen that K.W. was in fact breathing.

189.    Taylor also told them it was her understanding CSA had admitted K.W.'s death was from natural causes and had stopped pursuing that manufactured concern.

190.    Taylor told them it was not until approximately 7:15 a.m. that Jeremy had gone into K.W.'s room to wake her up for school that he found his daughter deceased in her bed; she had not been left "unattended" for twelve (12) hours, nor any period of time longer than any normal ten (10) year old child who goes to bed and sleeps in their own room.

191.    Taylor told them that all of their claims were completely untrue, and that she and Jeremy never neglected K.W. in any way.

192.    Taylor told the social workers that she was there like a biological parent for K.W., treated her as her own daughter, and even cared for K.W. about 50% of the time during an approximate five (5) month separation as a couple.

193.    Taylor added, if she was so uncaring about this child, then why did she spend seven (7) days in Children's Madera Hospital when K.W. was going through a G-tube placement?

194.    When Taylor and the two grandmothers also chimed in disputing COBBS claims, COBBS stated, "Well that's what is in our paperwork, and that is what we go by."

195.    That statement by COBBS was true, COUNTY/CSA social workers go by their own narrative of facts and history, regardless of whether it is correct or falsified from the inception of a matter.

196.    Taylor and/or one of the grandmother's pointed out a common sense way to assess how and why K.W. died, telling COBBS she should "go by" the death certificate or autopsy report, both of which would verify that K.W. had died from the natural sequalae of her illness, Sanfilippo Syndrome.

197.    COBBS response, in the face of a suggestion to look at the death certificate and/or autopsy report, was that "we believe K.W.'s deterioration was due to neglect on Jeremy's part which led to her death."

36

198.     The documents Taylor and the grandmother were referring to, were literally in the files of the case involving Jeremy and B.W., right there in the building they were sitting in even if COBBS did not have the file there in her hands.

199.     At no time did COBBS, JONES, or TOUT, go or ask someone to go, and simply get and read those rather "summary" documents as to the passing of K.W.

200.     Taylor told her, "Children with her disease virtually all die between the ages of ten (10) and fifteen (15), and when K.W. died, she was ten (10), so how it is that anything Jeremy did or did not do led to K.W.'s death?"

201.     The question was admittedly rhetorical, and Taylor received no response from any of the three, TOUT, COBBS, or JONES.

202.     COBB, nor JONES, nor TOUT had any specialized medical training of any kind, much less highly specialized medical training to legitimately form or express an opinion about the death of a child with Sanfilippo Syndrome; sadly, it did not stop them from doing so.

203.     It was clear that no amount of logic or truth was going to matter, thus Taylor, Melynda, and Paula gave up, and the conversation turned to the inquisition about how Taylor was going to keep A.W. "safe" from Jeremy, a man who had never been arrested or charged of any crime of neglect or abuse, against any child, ever.

204.     JONES begins asking Taylor if she had "made up her mind as to where she wanted to go," following up on his threats from the day prior, where Taylor had to decide where to go or have her child removed – and apparently had not decided fast enough on November 1st.

205.     At that moment, Taylor thought to herself exactly about what Mr. Courney had told them outside of the meeting.

37

206.    Taylor absolutely did not want to go to her mother's home in Utah, but as she had told COBBS and JONES in the hospital, she was not going to go to either of her sisters' homes and risk subjecting their young children to CSA intervening in their lives.

207.    Taylor had the same fears as to the idea of bringing up staying with the Crespos in Fort Bragg, as they also had children in their home.

208.    But the overarching reason for deciding not to bring up the Crespo / Fort Bragg option was the comments by the social workers about how Utah would be "good" or "great" because it was so far away from Jeremy.

209.    It seemed to Taylor, and to Melynda, like saying that she would go to her mother's home in Utah was the only possible answer that would allow her to get A.W. returned to her, so she indicated that would be the "plan."

210.     TOUT, COBBS, and JONES then expressed that they liked that answer, and turned to the issue of how soon she would leave for Utah.

211.     Taylor and Paula explained as soon as A.W. was back in Taylor's possession, Paula would call Southwest Airlines, where she had a ticket for herself for a later date in November. She would change the ticket to Taylor being the passenger and change the date of travel to Utah to as soon as possible.

212.    The tribunal of social workers agreed that would be acceptable.

213.    Taylor had been told by Dr. Pont who performed her C-Section that she would need to engage in no work, and engage in minimal activity, for six (6) weeks post her C-Section.

214.    This topic came up because Taylor expressed displeasure with the fact that she was now going to lose her job of over a year and half and the health insurance that went with it.

38

Complaint
Webb, et al. v. County of Stanislaus, et al.
U.S. District Court – Eastern District of California
Case No.

215.    Taylor had been working for Bronco Winery as a "replenisher," responsible for moving finished product as needed in the facility and packing pallets for shipments to fulfill purchase orders in April of 2018.

216.    Through Taylor's employment, she had full health benefits for her and was of course going to add A.W. to her insurance in November.

217.    Taylor told them how she did not want to lose her job, how she relied on the health care insurance from the job and was intending to put A.W. on her employer-subsidized health insurance as soon as she returned to work.

218.    TOUT, COBBS, and JONES dismissed Taylor's concerns entirely, simply saying something about how it was unfortunate, but she could "find another job," there was always some kind of public-assistance subsidized health insurance for mothers with newborns, and, she could receive child support from Jeremy.

219.    Paula told the social workers that during the six (6) week prohibition from work that was medically imposed, Paula would "support" Taylor and the baby financially.

220.    At no time, did any participant in the TDM from CSA bother to ask about Paula's financial circumstance, her income, her assets, her debts, or anything of the sort.

221.    Paula worked as a dental assistant, and the social workers were told that.

222.    However, Paula was earning less than $40,000 a year, was barely able to keep herself afloat financially, and was renting a room in a built-out basement in a home in Clinton, Utah.

223.    Then TOUT said in reference to the move-to-Utah plan, "This all sounds good, but are you willing to file for full legal custody of A.W. – because Jeremy is the father, he has rights and we can't have him fighting this."

Complaint
Webb, et al. v. County of Stanislaus, et al.
U.S. District Court – Eastern District of California
Case No.

224.     These social worker Defendants were now intending to use Taylor, by virtue of their holding her daughter hostage and A.W.'s release conditioned on Taylor's cooperation with their demands, to interfere with Jeremy's rights to his child.

225.     As with everything else being hoisted upon Taylor by these Defendants, Taylor did not want to file legal proceedings against Jeremy for anything because, unlike these state actor Defendants, Taylor actually knew Jeremy. She knew how he was a good father, a man she had watched dutifully care for his invalid daughter, while handling twelve (12) plus hour workdays (with the commute), in ways only parents who have invalid children could hope to understand.

226.     However, given the fact they still held A.W. and would not return her unless she complied with their demands, Taylor simply had no choice but to comply.

227.     Taylor responded, "If that is what has to happen in order to have you return my daughter, that is what I will do."

228.     TOUT asked Taylor if she thought Jeremy would go along with this effort to take away all of his rights to his child, and Taylor said she believed that he would, knowing that Jeremy would not want his newborn baby thrown into the CSA foster care system and the mother of his child along with her dragged into the County of Stanislaus juvenile dependency system.

229.     With that, the social workers called Jeremy and put him on speakerphone.

230.     Jeremy, faced with the exact same threat, the continued detention of his newborn infant away from not only him, but his child's breastfeeding mother and placed in foster care, stated he would agree so that the baby could be returned to Taylor.

231.     Jeremy did tell them in the phone call that what they were doing was wrong and asked several questions of the social workers.

232.     Jeremy said they, their agency, had painted a false and contrived picture of him.

233.     As he was doing this "complaining" about COUNTY and what its social workers had done to him, TOUT began putting her head in her hands in a manner that seemed to comport with Courney's words that they "did not want to hear about how he was a good guy," or how the claims against him were false.

234.     Jeremy asked whether the situation of his having absolutely no legal rights to his child would be temporary or permanent.

235.     JONES assured Jeremy the situation would be temporary.

236.     JONES had absolutely zero legal training, was not a lawyer, and had no basis for expressing definitively that the suspension of Jeremy's legal rights to his child would be "temporary."

237.     The social workers, again with TOUT doing most of the talking, told Jeremy that once he completed the services that they (CSA) wanted him to complete in his dependency action with B.W., then he could go to court against Taylor and have his parental rights restored.

238.      Taylor, whose absolute main goal was to retrieve custody of her child, tried to reassure Jeremy that if he was done with CSA and wanted to have his rights restored she would say "no problem," adding that she would do so because, "I know you're a good father."

239.     Jeremy asked JONES at one point, "Why is all of this happening?" "We [Taylor and I] have never had any issues between us."

Complaint
Webb, et al. v. County of Stanislaus, et al.
U.S. District Court – Eastern District of California
Case No.

240.     JONES, rather than answering Jeremy's question, stated, "So you are agreeing that you will turn over your parental rights?"

241.     Although Jeremy reiterated that there have never been any issues about abuse or domestic violence by Jeremy against any of his children or Taylor, JONES claimed, "It [violence between Jeremy and Taylor] has been reported to the police."

242.     Jeremy and Taylor said they had never had any domestic violence between them, and Jeremy told them that there had never been a police call to the house regarding domestic violence between he and Taylor.

243.     Jeremy explained that any police involvement at his house since he and Taylor had become a couple a little over five (5) years prior, had all been related to his brother Josh.

244.     He explained Josh did not, and never had (other than when they were children) lived with Jeremy, and Josh had a long history of substance abuse issues that may or may not also be associated with mental health problems.

245.     TOUT, nor COBBS, nor JONES had any response to give that true statement of fact, and just ignored it.

246.     The next thing that was brought up about Jeremy's alleged "violence" was the claim that in the case involving B.W., the social workers investigating had claimed that B.W. told them – in an unrecorded, unwitnessed by any non-CSA employee interview – that B.W. had seen his father strike Taylor.

247.     The way it was stated by one of the social workers, was, "We have reported that B.W. watched his dad hit you in the face."

248.     Taylor told them once again, that is not true.

249.    Taylor and Jeremy, had in fact addressed the alleged statements by B.W. on February 25th, 2019, by going down to CSA offices to speak to the supervisor of Ophelia Nguyen, whose name is Claudia Llamas-Caballero, on February 27th, 2019.

250.    When they met Ms. Llamas-Caballero they asked her to actually look at Taylor closely and see if she could see any marks.

251.    Taylor of course had no marks on her and that was readily evident

252.    Taylor and Jeremy then asked her to take pictures to in fact document that there were no marks at all on Taylor's head or anywhere else.

253.    Taylor told TOUT, COBBS, and JONES, that when they offered Claudia Llamas-Caballero to take pictures of Taylor's head and face, she refused, saying, "It is not necessary."

254.    The social workers then ended the conference call with Jeremy, and continued to talk to Melynda, Paula, and Taylor.

255.    In addition to everything already described, JONES, COBBS, and TOUT told Taylor that she had to go directly after the meeting, and file papers in the family court seeking to take away any of Jeremy's custody rights.

256.    They told Taylor to take the form titled "Action Plan," the form which they repeatedly referred to as the "Safety Plan," down to the Court and file it with the papers that she would file to cut off all legal rights of Jeremy to his daughter A.W.

257.    They told Taylor that she had to put Jeremy's "full criminal history" on the family law filings in order to have the Court agree to grant full custody of A.W. to Taylor.

258.    As with everything else that TOUT, COBBS, and JONES were demanding of Taylor, as they would not return her child unless she agreed, she was forced to acquiesce to their demands.

259.     As everything appeared to be wrapped up and "agreed" upon, Taylor asked if they would now give her A.W. back, and TOUT told her, "No, we're not going to give her to you right now, but after you go down to the Court and bring us back the stamped copies, then you can have her back by tonight."

260.     In the concluding minutes of this abhorrent power-abusive meeting, TOUT said, "Taylor, the meeting is over, we're no longer taking notes. I wanted to ask you – has Jeremy ever hit you?

261.     Taylor replied emphatically, "No!"

262.     TOUT asked, "Has he ever been violent toward you?

263.     Taylor replied emphatically, "No!"

264.     TOUT asked, "Have you ever been in fear of Jeremy?"

265.     Taylor again replied emphatically, "No!"

266.     If the Defendants COBB, JONES, or TOUT had bothered to review the file of the case involving Jeremy and his son B.W., or possibly spoke with some social worker who had been involved in that proceeding, they would know that Taylor and Jeremy had maintained from their very first interview with a CSA social worker after K.W. passed and COUNTY removed B.W., that they had never engaged in any domestic violence between them.

267.     Then almost in passing, TOUT asked Melynda about Jeremy's visitation schedule with his son B.W. who was in Melynda's care, "How often does Jeremy see B.W.?"

268.     Melynda's response was, "He gets 2 hours, 2 days per week, unsupervised visits with B.W.," then correcting herself, saying, "Excuse me, that's been increased to 4 hours 2 days per week, usually on the weekends, due to [Jeremy's] work."

44

269.     It is unknown to PLAINTIFFS if TOUT, ANDERSON, COBBS, or JONES actually knew that Jeremy was having two four-hour unsupervised visits with his son B.W., but that information absolutely would be found in the very same "papers" – meaning the file on Jeremy's case with B.W. - that COBBS said they "go by."

270.     The entire time spent in this meeting with life-altering consequences for Taylor, for A.W., for Jeremy and the entire Westfall family, was approximately 35 to 45 minutes.

**STRAIGHT TO FAMIILY COURT TO FILE CUSTODY PAPERS**

271.     When the meeting ended, Melynda, Paula, and Taylor drove directly to the family law court in Modesto.  At the courthouse, Taylor had to pay for the forms that were needed to file for full legal and physical custody of A.W.

272.     Paula and Melynda brought the papers over to Taylor, and Taylor refused to write up the declaration upon which the requested orders would be granted or denied.

273.     When Taylor refused, Paula said that she would write them up, and indeed all of the filed family law papers requesting sole legal and physical custody of A.W. by Taylor are in Paula's handwriting.

274.     Melynda, said more than a couple times, that they should not be filing these papers at all, knowing as did Paula and Taylor, that they were stating lies to the Court, and lies under penalty of perjury, all because of the threats and coercion of TOUT, COBBS, and JONES.

275.     Paula completed the preparation of the family law pleading forms, however, the Clerks' office closed for some kind of an inter-office event for over an hour.

276.     While the Court was closed and they were waiting to file the family law pleadings, Taylor frantically searched the internet for an attorney to possibly consult with about the nightmare she was living in at that very moment.

277.     Taylor was able to speak briefly with an attorney in Sacramento area named Joseph Weinberger and took a photo and either e-mailed or texted Mr. Weinberger a picture of the "Action Plan" she was forced to sign at the TDM.

278.     When the clerk windows re-opened and the family law filing was submitted, Taylor was told to come back in two days, between 1:30 and 3:00, to receive the papers, whether the requested orders would be granted or denied.

279.     The clerk asked if she (Taylor) was going to be picking them up, or another person, because if another person was going to then Taylor would need to sign a sort of permission slip that would allow the other person to pick up the papers.

280.     Thinking at the time that she would be in Utah by then, Taylor took and signed two of the forms, but left the actual name of the person who might be picking them up blank, thinking she would ask either Frank Westfall or a Westfall family friend named Mike to pick up the papers when they were ready.  That is what Taylor did, giving the signed permission slips to Frank, and now either man could go pick up the filing once the Court had ruled upon it.

281.     With the file-stamped family law filed papers in hand, but the requested orders not yet reviewed or much less granted by the Court, Taylor took pictures of the papers and Paula e-mailed them to COBBS.

282.     The response to the e-mail was that they were received, and a supervisor would be calling Paula with a time and place to pick up A.W.

283.     Paula was also told by COBBS that she needs to keep her phone nearby because "they" don't like to "waste time."

284.     Taylor was not reunited with A.W. until approximately 8:00 p.m. on November 1st,

2019.

285.     Shortly thereafter, she sent an e-mail to Joseph Weinberger, which stated the

following;

> **From:** Taylor webb <taylor.*********>
> **Sent:** Friday, November 1, 2019 9:40:42 PM
> **To:** Joe Weinberger <Joe@weinbergerlaw.net>
> **Subject:** Re: [A.W.] Westfall
> I have custody back and [A.W.] is home with me and we are leaving to Utah on
> Monday. I was forced to file fully custody papers in order to get [A.W.] back in
> my custody. When at the meeting today I was told I had to submit the paper I sent
> you earlier in order to be granted fully custody Immediately. I also had to write
> out a statement stating why I felt Jeremy's rights should be taken away and was
> forced to say thing I truly do not believe. I was made to say thing I do not believe
> in any way shape or form to make him out to be the bad person in order to have
> [A.W.] in my custody again. I submitted false information in order to do what I
> had to be the best mother I can be to [A.W.]. They also continue to bring up false
> information about my stepdaughter [K.W.] and her passing saying that she was
> neglected for over 12 hrs without any supervision the night she passed away.
> They stated that a call was made to the police again mine and Jeremy's house
> stating that they had believed domestic violence was going on in the home. They
> also stated that me and Jeremy were fighting that night and I took [B.W.] and left
> the house and did not return that night which did not happen. On Tuesday day a
> copy of the order I placed today is being released and I'm having it picked up and
> mailed to me I will get you a copy of it and send it to you by mail or fax please let
> me know the best way to get you the copy of the order. If you have any questions,
> please reach out to me any time by phone or email. My cell phone number is
> (209) ***-**** Thank you for everything you are doing for my family.

286.     On November 1st, after the filing of the family law papers seeking temporary custody

of A.W. with Taylor – and keeping A.W. away from Jeremy – Taylor and Paula went to the

home of Jeremy's parents (Frank and Melynda Westfall), in order to drop of Melynda.

287.     During Paula's time at the home Paula approached Jeremy and she said this while

giving Jeremy a hug, and in the presence of Taylor, Frank, and Melynda, "I'm sorry I

submitted these papers, it's not true what is put on these papers," and she told Jeremy, "I love you."

288.     She said to Jeremy, "You can come out to Utah and visit your daughter anytime you want."

289.     In conversations recorded in Utah after Taylor awoke from the medically induced coma about to be described below, Paula Webb claimed that CPS claimed they had "nothing to do with it," referring to the family law court filing, and "that's bullshit, that's pure bullshit, I don't care what they said, I don't give a fuck."

**RE-ADMITTED TO HOSPITAL**

290.     After completing the filing required by JONES, COBBS, and TOUT, in order to receive A.W., Paula and Taylor dropped Melynda off at her home and continued to the designated location for receiving A.W. back into Taylor's care.  From there, Paula and Taylor drove to Taylor's sister's house (Kimi) located in Manteca.

291.     Shortly after arrival at Kimi's home, Taylor began experiencing shortness of breath. She mentioned it initially to her mother Paula, and Paula's response was that she simply needed to "relax" because they had been "going all day."

292.     Taylor got A.W. situated for bed, then went to bed herself.  At 1:30 a.m. Taylor woke up experience far more severe shortness of breath.  She turned to her mother and told her, "I need to go to the hospital."

293.     Paula's reply was, "Ok, put the baby in the car seat and get her diaper bag ready." Taylor was stunned that given her obvious serious health problems Paula's response was for her to put the baby in a car seat and get the diaper bag ready, but rather than argue, she did so

Complaint
Webb, et al. v. County of Stanislaus, et al.
U.S. District Court – Eastern District of California
Case No.

and they got in the car and drove to Memorial Medical Center in Modesto. This was the only medical facility that was covered by Taylor's insurance.

294. They arrived at the hospital at approximately 2:30 a.m. on the 2nd of November, 2019, and Taylor was promptly admitted to the emergency room. X-rays were taken and some blood work was performed. After approximately five (5) hours, Taylor was admitted to an actual private hospital room. Paula had left the hospital with A.W. well before Taylor was admitted to a private room.

295. That event of being admitted into the private room was the last thing Taylor remembers, because sometime within the next twenty-four (24) to thirty-two (32) hours, she is informed and believes that she was placed into a medically induced coma. She would later learn that she was suffering from pneumonia and preeclampsia, as well as an infection. In addition, she was suffering from "PRES," which is commonly referred to as "swelling of the brain," which was creating significant intercranial pressure.

296. Taylor remained in the coma, and was fully intubated and catheterized, with intravenous feeding tubes and a regimen of antibiotics flowing into her body at least three or four days.

**PAULA SEEKS GUARDIANSHIP ON ADVISEMENT OF COUNTY**

297. At an unknown point after Taylor had been placed into the coma, but prior to November 5th, 2019, Paula contacted COBBS, JONES, and they directed her to seek a guardianship over A.W.

298. The social workers told Paula that she had to file the Guardianship papers in order to keep them out of Taylor's life; though this is according to Paula in an audio recording of a

conversation between Taylor and Paula in Utah so the allegation can only be said to be on information and belief based on that recording at this time.

299.     Eager to do the social workers bidding based on her own fear of the social workers and their "child protective services," Paula promptly prepared and filed pleadings on November 5th, 2019, in the Stanislaus Superior Court seeking to have herself declared the Guardian of A.W.

300.     Paula received a "Temporary" Guardianship order filed on the 15th of November, 2019, at which time Taylor had been out of a coma for several days.

301.     As of the filing of this Complaint on December 9th, 2019, although Taylor is no longer in a coma, Paula Webb has refused requests by Taylor's counsel to dismiss the Guardianship proceedings.

302.     Paula arranged with COBBS and/or JONES, to have Jeremy served with the Guardianship pleadings, and provided them with a copy to do so; the details of the service of those papers on Jeremy is addressed hereinbelow.

303.     It is unknown who from COUNTY was the actual man who served Jeremy on the 15th of November, 2019, but he was wearing a shirt with readily visible printing or stitching on it stating, "County of Stanislaus," and had some form of a "badge" on his person.

**TAYLOR WAKES FROM COMA**

304.     When Taylor woke from her coma, the first thing she became acutely aware of within the first twenty-four (24) hours on a cognitive level beyond merely recognizing who everyone was and being able to speak – albeit speaking incoherently for a couple of hours - was that her mother had begun dictating all sorts of decisions that were Taylor's to make.

305.    For example, Paula had begun dictating who could come to the hospital to visit Taylor.

306.    Paula had taken Taylor's wallet, and denied to Taylor that she had it, only giving it back to her when they later arrived in Utah.

307.    Paula had taken Taylor's cell phone, and refused to give it back to her, telling Taylor initially that she had installed a different password and refusing to give the phone or the password to Taylor.

308.    On a later day, as the argument about Paula's seizure of Taylor's phone continued, Paula claimed that after installing the different password she was at some point recharging the phone, she went to enter the password she had put on the phone and she could not remember the password she used, so she was unable to do so within three tries and the phone had become deactivated.

309.    One of the very first things that Taylor sought when she came out of her coma, was the companionship of her five and a half (5 ½) year partner, and father of her child, Jeremy.

310.    Taylor told Paula she wanted Jeremy and wanted to know where Jeremy was.  Taylor asked for her phone so she could call Jeremy.  Paula told her that she wasn't allowed to have her phone in the hospital, it was "hospital policy;" she would only tell her about the prior "password" and "deactivation" issue a day or so later.

311.    What Taylor did not know, was the full extent of Paula's sudden hostility and refusal to communicate with the Westfall family members.

312.    Paula did speak to both Melynda, and Frank on one or two occasions when Taylor was admitted and when Taylor was actually in her coma, but after that calls were not picked up by Paula nor callbacks made but on a handful of occasions.

51

313.     Paula began refusing to even answer the phone when a Westfall family member, including Jeremy, would call.

314.     This created a significant amount of hostility in the Westfall family for Paula, who was keeping them away from Taylor whom they had for over five years treated and accepted Taylor as a member of the family and literally the mother to Jeremy's children, Frank and Melynda's grandchildren.

315.     Not surprisingly, this was creating a lot of hostility between Taylor and Paula as well.

316.     Paula was engaging in the same type of overbearing, must-control-everything behaviors Taylor had experienced her entire life with her mother.

317.     Indeed, Taylor had on more than one occasion cut-off all communication with Paula, and on one of those occasions the period of no contact lasted approximately two (2) years.

318.     This was one of many facts shared with COBBS and JONES when they would later appear at her hospital bed when recovering from her coma.

319.     As Taylor became more and more lucid over the next day or so upon coming out of the coma, Paula kept telling Taylor that if she didn't go to Utah with her then Paula was going to have full custody of her daughter, and telling Taylor that she had to "choose between A.W. and Jeremy."

320.     Paula also told Taylor that she had to "break up" with Jeremy, numerous times.

321.     On one particular day, exact date unknown, Paula told Taylor that she was just going to leave with the baby for Utah.

Complaint
Webb, et al. v. County of Stanislaus, et al.
U.S. District Court – Eastern District of California
Case No.

322.   At some point, a nurse or other hospital staffer explained to Taylor that if she felt her mother was interfering in Taylor making her own decisions, then she could contact a hospital "advocate." Taylor did so promptly after she learned of this possibility.

323.   Strangely, shortly after Taylor requested to speak with a hospital advocate, Jeremy was allowed to visit her in the hospital.

324.   The day that Jeremy came to the hospital to visit with Taylor, which was November 10th, 2019, things again got ugly as to Paula and her behaviors.

325.   Early in the morning, Taylor had called her mother and told her that Jeremy was coming to the hospital to visit her and the baby that day, and that the hospital had told her that was fine.

326.   Paula was immediately angered, and after she hung up the phone with Taylor, Paula called COBBS and/or JONES to advise them that Taylor was allowing Jeremy to visit her in the hospital.

327.   Then after Jeremy had arrived and was visiting with Taylor, Paula called Taylor again on the hospital's line complaining that Jeremy is not allowed to be in the hospital at all.

328.   Taylor told her that Jeremy was there visiting with her right then, and Paula became loud and agitated, saying how she had Jeremy excluded from the hospital!

329.   It is unknown to PLAINTIFFS at this time, the full extent of words and actions, Paula Webb took to keep Jeremy from visiting his girlfriend of over five years and mother of his newborn child, out of the hospital and unable to visit Taylor, and to what extent the words and actions that led to that state of affairs came from CSA personnel and/or COBBS and JONES themselves.

330.     A nurse in the room, hearing the discussion between Taylor and Paula interceded by taking the phone and telling Paula that Taylor wanted to visit with Jeremy, and going so far as telling Paula that this day was going to be "Jeremy day" and she should let Jeremy and Taylor visit without any interruption.

331.     When the nurse handed the phone back to Taylor, her mother said she was "coming down there," and that she was bringing "backup."

332.     Taylor and Jeremy did not know whether to believe Paula or not, but continued visiting, hopeful that would be the end of the issue; it was not.

333.     To Taylor and Jeremy's surprise, Paula was at the hospital within an hour and she had brought Taylor's sister's fiancé – now husband – a twenty-two (22) year old man named Angel, whose behavior was far from "angelic."

334.     Immediately upon arrival Angel attempted to instigate a fight with Jeremy, getting in his face and calling him names, threatening to "kick [his] ass."

335.     Security responded to the room and escorted Paula and Angel from the building.

336.     Paula, angry about the insult, contacted COBBS and/or JONES again, telling her/him Jeremy was at the hospital; exactly what all she claimed to the social workers with regard to the incident is unknown.

337.     What is known, is that COBBS then contacted the hospital and after speaking to unknown persons at the hospital, and making claims about Jeremy being violent and dangerous, a flyer of sorts was generated by the hospital and placed at least in Taylor's room (by affixing it to the wall with tape), and presumably provided to hospital security.

338.      The flyer showed a picture of Jeremy walking through the hospital, and in writing stated all of the following below the picture;

Complaint
Webb, et al. v. County of Stanislaus, et al.
U.S. District Court – Eastern District of California
Case No.

"According to Child Protective Services (CPS) Jeremy has a history of violence. The patient in room 5430 [Taylor] i[s] a no info patient due to the history presented by the above individual. His business on MMC property has concluded and is not allowed on property unless seeking medical attention. If this individual is see on property, please contact the Department of Protective Services at ext. 7233 (SAFE) or at (209) 572-7233.

DPS Officers if a report is received or this individual is seen ask the gentleman to leave property and if he refuses contact Modesto Police Department. DPS Officers will also be conducting frequent patrols through and around Surgical Blue to deter any incident from occurring."

339. PLAINTIFFS do not know at the time of filing this complaint who took whatever action it was that placed Taylor as a "no info patient," but will amend this complaint to name that person as a Defendant when ascertained.

340. PLAINTIFFS are informed and believe, and therefore allege on the alternative based on a recorded conversation between Paula and Taylor in Utah, and Paula's own statements, that Paula "got him [Jeremy] kicked out of the hospital."

**FIRST POST-COMA SOCIAL WORKER HOSPITAL**

341. While Taylor remained in the hospital recovering from the trauma of her medical procedures and coma, COBBS and JONES came to her hospital room on two occasions between Taylor coming out of the coma and being discharged from the hospital on November 15th, 2019.

342. On the first occasion COBBS and JONES arrived and after obligatory conversation about Taylor looking better, and questions about how she was feeling, COBBS and JONES started inquiring about Taylor's anticipated discharge and the "Safety Plan" of Taylor leaving for Utah with her mother.

343. Taylor tried to push back on the "go to Utah" idea.

55

344.     Taylor told them that her mother was an unbelievably overbearing person, told them how she had actually cut relations with her mother a couple of times previously, including an approximate two (2) year period of time.

345.     Taylor also explained about what she had done in terms of taking her phone, excluding Westfall family members, and even trying to interfere with Jeremy visiting in the hospital, including bringing the soon-to-be brother-in-law Angel who tried to start a fight with Jeremy and had to be escorted from the hospital.

346.     The social workers said nothing in response, showing not the slightest concern for what Paula had or had not done.

347.     The social workers did not follow up with Taylor, or with Paula or anyone else, about all the things Taylor told them about Paula that day.

348.     Taylor believes the day of this first visit was within a day or two of coming out of the coma.

349.     The only concern expressed by COBBS and JONES during this visit was Taylor's expected compliance with their forced "Safety Plan."

350.     Taylor asked what would happen if she did not go to Utah.

351.     JONES replied that if she did not comply with the "Safety Plan," then A.W. would be removed from her and placed in foster care and she may not ever get her back.

**DAY BEFORE SECOND POST-COMA SOCIAL WORKER VISIT**

352.     On November 10th, 2019, Jorge, Salisha, and their daughter Isabella came to Taylor's room at the hospital; Jeremy was already there.

353.     On this day Taylor appeared to the Crespos as healthy and in good spirits.

354.    Salisha Crespo is in fact a registered nurse and although Taylor's responses to questions, or in discussion were a bit delayed, some delay is normal.

355.    Together the five of them talked for over an hour.

356.    Salisha again offered, "You can stay with me and my family in Fort Bragg, CA for as long as you need.  Utah is so far away."

357.    Taylor responded, "Yeah I'd rather do that then go there too."

358.    They even discussed sleeping arrangements if Taylor and A.W. were to come there, and Taylor said the suggestions were fine, "Just until we can figure this out."

359.    Taylor was fatigued after an hour's discussion so the Crespos said they would leave, but would be back in the morning to have one more visit before the 6 hour drive home.

**SECOND POST-COMA SOCIAL WORKER HOSPITAL**

360.    Then on November 11th, 2019, at approximately 9:30 a.m., JONES appeared in Taylor's hospital room without COBBS or anyone else.

361.    At the time Taylor was being visited by Jorge and Salisha Crespo and their daughter Isabella before they returned for home in Fort Bragg.

362.    JONES first came to the doorway, holding a cell phone and clipboard and saw the Certified Nurses Assistant also in the room, and asked, "Is Taylor awake and receiving visitors?"

363.    The CNA said, "Yes, come in."

364.    After brief introduction of JONES to the Crespos by Taylor, JONES started talking to Taylor.

365.    JONES said to Taylor, "Do you remember the conversation we had before?"

366.    Then they went back and forth about which conversation he was referring to.

57

367. JONES said, "About A.W. and your plan?"

368. Taylor said, "If it was about the false statements made by my mother and sister. Those statements were false. "

369. JONES said, "Do you remember the agreement we had about A.W.?" He tried to get her to talk about the conversation regarding an agreement they had about A.W..

370. Taylor, "About going to Utah? I don't want to do that.  I'd rather go with my family friend to her house in Fort Bragg."

371. JONES said, "Do you remember the conversations that took place with another social worker before the coma?"

372. Taylor, "I have a hard time remembering conversations before the coma."

373. They went back and forth until she started to recognize his name and the conversation they had about A.W. and her welfare.

374. Salisha asked, "Is A.W. already in Utah with her mother?"

375. JONES said, "yes she is."

376. That made Taylor upset.

377. Taylor, "Those statements made were false." he tried to refocus the conversation to the previous agreement made that she did not remember.

378. JONES said, "But do you remember the plan that was made?"

379. At this point the gentlemen asked Taylor, "is it ok that they are in the room and ok that we are talking about this?"

380. Taylor stated, "Yes I consider them family.  This is who I want to stay with in Fort Bragg."

381.    Salisha asked again because she thought she had heard JONES wrong, "Are you telling me that A.W. has left the state with [Taylor's] mother?"

382.    JONES said, "Yes."

383.    Jorge was visibly upset, and said, "Why is CPS letting a California child be sent to Utah?"

384.    JONES stated, "There was an agreement set up prior."

385.    Jorge said, "Is CPS too busy to take care of this child that's why you sent her off to another state?"

386.    JONES replied, "It's [a] child safety [issue]."

387.    Jorge said, "No, there are plenty of options, family and friends here in this state including my wife and I."

388.    JONES said, "The father has a domestic violence ["charge" or "case"] background and that's why we are concerned about safety."

389.    Salisha then clearly stated, "It was over ten years ago, the mother was a heroin addict and he didn't want her doing drugs in front of the babies and he threw her out. Taylor would never accept abuse in any form especially from a partner!"

390.    Jorge, "Why don't you have the information or circumstances of the case in the file for reference?"

391.    JONES said, "I am an emergency response worker and don't have all of that information."

392.    Jorge said, "Why with computers, interoffice email, cell phones, paper files why can't you keep track of what is happening in which case and when. Instead of jumbling all together?"

Complaint
Webb, et al. v. County of Stanislaus, et al.
U.S. District Court – Eastern District of California
Case No.

393.     Then Salisha basically told Jorge to shut up.

394.     Then Salisha again commented and offered to have Taylor and A.W. stay with her and Jorge in Fort Bragg, CA.

395.     In response to that, JONES took Salisha's name, home address, as well as her home and cell phone number.

396.     Salisha offered JONES her driver's license number, Social Security number, and Registered License number license as well.

397.     JONES declined to take any of the additional offered information, saying, "No that will be enough."

398.     Salisha asked, "Would staying with me impair Taylor's ability to retrieve A.W. from her Mom?"

399.     JONES said, "No."

400.     Salisha also asked, "Who initiated this case?"

401.     JONES said, "She did," gesturing towards Taylor.

402.     Salisha told JONES, "Jeremy never laid a hand on Taylor or the kids and this whole ordeal is ridiculous."

403.     JONES appeared ready to ask some more questions but the doctor showed up on his rounds with Taylors nurse.  The doctor began a short introduction and started to talk about Taylor and her condition.  The results of an Echocardiogram had diagnosed her with mitral valve regurgitation.

404.     Taylor asked a question or two about those findings and the doctor said she would be seen later in the day by the cardiologist.  The doctor then said he was going to perform an exam and asked if it was ok that everyone was still in the room.

60

405.    JONES and Jorge left the room immediately, and Isabella shortly afterwards.  After the exam Salisha asked if Taylor would be discharged that day or not.

406.    The doctor replied maybe, but that would be up to the cardiologist and Taylor's obstetrician.  After the doctor left Jorge and Isabella returned to the room.  JONES was no longer in the hall or the room at that point.

407.    A little while passed and my Isabella and Salisha left the hospital room to use a restroom.

408.    As they walked down the hall towards the elevators they saw JONES on his cell phone in the small lobby.

409.    PLAINTIFFS are informed and believe that JONES was on the phone to supervisor ANDERSON, or another supervisor, advising of Taylor's reluctance to proceed with the "Safety Plan" and desire to stay with the Crespos in Fort Bragg.

410.    When Salisha and Isabella returned to the room, they stayed for a short while longer and again offered to have Taylor stay with them and asked her to let them know when, and where to pick her up if necessary.  By this point it was around 11:00 p.m.

411.    They all said their goodbyes and the Crespos left for home in Fort Bragg, California.

412.    JONES had come to the hospital a second time, so quickly after the first, because Taylor had expressed deep reservations to her mother about leaving with her mother to Utah.

413.    Paula had remained in almost constant contact with COBBS and/or JONES, and was telling them how from shortly after Taylor coming out of a coma and being reminded of this "agreement" that she would go live with Paula in Utah, Taylor was expressing strongly how much she did not want to do that.

//

**HOSPITAL DISCHARGE / TRAVEL UTAH / SERVICE OF PAPERS**

414.     Taylor was discharged on November 15th, 2019 from the hospital.

415.     She was given a prescription for drugs that would help dealing with persistent symptoms of high blood pressure she was experiencing.

416.     Rather than Paula having claimed in the TDM that she was going to book a flight for her physically and emotionally beleaguered daughter – which comments were made even before a full blown three-four day long medically induced coma on Taylor - Taylor, Paula, and newborn A.W. drove to Paula's home in Utah in Paula's car a trip of approximately twelve and one-half (12 ½) hours.

417.     Upon arrival at Paula's home, the lording over Taylor and baby A.W. by Paula increased exponentially.

418.     At some point on the 16th or 17th of November, Paula began telling Taylor that she had "guardianship" of A.W. and thus she was the one with "custody" of A.W.

419.     In support of this claim Paula threw a small bunch of apparent legal papers in Taylor's direction, titled "Guardianship."

420.     Taylor was distraught, and unable to understand, much less explain the papers that her mother had given her if asked.

421.     The provision of the legal papers to Taylor by Paula Webb, did not constitute lawful service of process on Taylor, and therefore she was not legally obligated to surrender A.W. to her mother, nor was she obligated as a matter of law to the terms of the "Safety Plan" that social workers TOUT, COBBS, and JONES had forced upon her, A.W., and for all practical purposes, Jeremy.

422.    As it turned out, Paula had served Taylor with Guardianship papers that she had filed on November 5th, 2019, when Taylor was in a coma.

423.    Paula had alleged in the declaration supporting the request for Guardianship that a guardianship be imposed, with her as the guardian of A.W., because of the fact Taylor was in a coma.

424.    Paula also claimed in the declaration in support of her request, that she had "permission" to make decisions on behalf of Taylor and A.W.

425.    Paula's claim of some "permission" to make such decisions was false.

426.    Paula also checked a box in the Guardianship application papers indicating that Jeremy had "consented" to her assuming Guardianship of A.W.

427.    Paula's claim Jeremy had "consented" to her assuming Guardianship of A.W. was also false – she had never even consulted with Jeremy on the issue of assuming Guardianship of A.W. much less obtained his "consent."

428.    In another form filed with the Guardianship application, known as a "Declaration Under Uniform Child Custody Jurisdiction and Enforcement Act," Paula claimed that A.W. lived with her in Clinton, Utah, and put her home address on the form.

429.    The claim that A.W. lived with Paula in Clinton, Utah, was also false.

430.    The documents Paula Webb submitted to the Court in support of her efforts to take Guardianship of A.W. from which the representations just referenced all came, were all documents sworn to under penalty of perjury, and at a minimum contained the false statements cited above.

431.     Though it is unknown what documents Paula may have filed to receive it, she was granted a Court "fee waiver." Such fee waivers typically require a "documented inability to pay" for the Court's legal filing fees, in order to be granted.

432.     The particular form used by the Stanislaus County Superior Court (a form known as a "FW-100") states in its preamble, "If you are getting public benefits, are a low-income person, or do not have enough income to pay for your household's basic needs and your court fees, you may use this form to ask the court to waive your court fees."

433.     Meeting these requirements would make it unlikely that Paula could suddenly take on the care and support of not only A.W., but her mother Taylor, as she claimed in the TDM she was able to do during Taylor's recovery from C-Section surgery.

434.     Taylor would later learn, after she had left Utah with her child, that Paula had been told by social workers COBBS and JONES to go to the Court and seek a guardianship of A.W.

435.     PLAINTIFFS are informed and believe that it was actually COBBS and/or JONES who picked up the Guardianship papers from the Superior Court, and did the same with the family picked up the Guardianship papers from the Superior Court, and did the same with the family law filing made by Taylor on November 1, 2019 – which had resulted in a temporary order placing A.W. in Taylor's sole legal and physical custody.

436.     In the alternative PLAINTIFFS allege that Paula provided the court filed family law and Guardianship papers to COBBS and JONES and/or delivered them to COUNTY/CSA offices.

437.    What the social workers then did with the court filings, was to serve them on Jeremy during their shifts as employees of COUNTY, thus, incurring public expenditures for their salaries, acting as personal process servers for private individuals.

438.    The manner in which they (COBBS and JONES) accomplished this was contacting Jeremy and telling him that they wanted to come by and check out his house at 5:30 p.m. on Friday, November 15th, 2019, telling Jeremy this was part of the process of returning B.W. to his care.

439.    Jeremy was of course excited and eager to accommodate their request and was dutifully waiting at 5:30 p.m. when a white van pulled up to his home, and a somewhat chunky African-American man approximately six (6) foot tall got out of the van carrying papers.

440.    No social worker that had ever been a social worker on Jeremy's case with B.W. got out of the van; Jeremy did not recognize the man at all.

441.    As it turned out, the social workers had no intention of "checking out" Jeremy's house for the return of B.W., they just wanted to make sure Jeremy was at a specific place at a specific time so that he could be served with the filings in the family law and Guardianship courts.

442.    As soon as Jeremy opened the door to greet the man, he served Jeremy with the filings in both the Guardianship action filed by Paula, and the family law filing filed by Taylor, then turned and walked off.

443.    In the papers the man served on Jeremy, which he promptly scanned and forwarded to his attorneys within twenty-four (24) hours, there was notably absent any documentation of an "ex-parte" request by Paula to seek Temporary Guardianship of A.W., nor was there any

Complaint
Webb, et al. v. County of Stanislaus, et al.
U.S. District Court – Eastern District of California
Case No.

"order" actually granting Paula Temporary Guardianship of A.W. It was apparent Paula had received the quality of service of process for which she had paid, which is to say, California state taxpayers had paid.

**BACK IN UTAH**

444. On November 18th, Taylor found the opportunity to slip away from Paula and purchase another cell phone.

445. With that cell phone, Taylor began communicating with Jeremy, and with her other attorney Robert Powell in California.

446. Later that day, November 18th, 2019, Taylor was sitting and holding the baby and texting on the new phone, when Paula saw her with the phone and angrily asked "How did you get that phone."

447. Taylor said, "I just did."

448. Paula replied, "Why aren't you going to tell me?"

449. Taylor replied, "Because I'm 25 years old and I can make my own decisions."

450. In response, Paula reached out and snatched the power cord out of the phone, rolled it up, and put it in her pocket, then headed upstairs out of the basement dwelling and outside to smoke a cigarette.

451. After a short while when she came back, Taylor asked nicely for the return of her power cord, and Paula briskly said, "No."

452. Taylor followed Paula to her room and again asked politely for the power cord to her cell phone, and Paula said loudly, "No!"

453. Then, Paula promptly got up from the bed she was lying on, put her hands on Taylor's back, and pushed her out of her room, causing Taylor to nearly fall.

454.    Taylor had A.W. in her arms the entire time.

455.    Because Paula had pushed Taylor violently and in anger, and she had taken Taylor's power cord to cut her off from any outside communication, her escalating violence caused Taylor to call the police.

456.    Clinton Police Department responded to the home and took a police report; however, they did not arrest or cite either Taylor or Paula.

457.    On that same date, Taylor recorded Paula as she was screaming at her to, "Get out of my fucking house," amongst other choice words not denoting endearment or "support."

458.    On the 19th of November 2019, one day after the incident involving the police, Taylor called CSA and spoke to supervisor Eric Anderson.  Taylor called ANDERSON because she had learned from Jeremy that he had spoken to ANDERSON and it was at least Jeremy's belief that ANDERSON was the highest-ranking supervisor over the matter of Taylor and A.W.

459.    Taylor began by asking if he had a case number for her – meaning a juvenile dependency case number - related to her and A.W.

460.    Though Jeremy had recommended she speak to ANDERSON, the first impression she got from his comments, was that he was not super clear on what case she was calling about.

461.    ANDERSON responded to her inquiry, saying, "No, we only go by the mother's name."

462.    In response, Taylor then repeated her name and the name of the baby and commented on the fact that he had spoken to the father of the baby, Jeremy Westfall, several days earlier.

463.    ANDERSON then mentioned that he had been out of the office and just returned and had not fully "caught up" yet.

464.    ANDERSON did not at any time indicate that he was in fact not the supervisor over COBBS and/or JONES.

465.    ANDERSON then put Taylor on hold saying he was going to call COBBS and find out a little information about the case.  He then returned to the phone call with Taylor after about five (5) minutes.

466.    Taylor started telling him about the violence with her mother earlier that day, and she did not feel safe in that violent environment with her daughter, and if she could move to Fort Bragg with the Crespos she felt she would be far enough away from Jeremy to satisfy CSA's demands, and yet be in a safe environment with two very experienced foster care providers in the household and the ability for Jeremy to at least visit with his daughter, even if supervised.

467.    Taylor then began speaking to ANDERSON about what she and Jeremy had been through over the prior year and one-half.

468.    Taylor explained about Jeremy's mother's death, K.W.'s death, and the struggles of dealing with CSA vis-à-vis Jeremy's case with B.W.

469.    In response to all of this, ANDERSON'S only substantive comment was, "You keep saying 'we' as if you and Jeremy are still together."

470.    Taylor said, "I keep saying 'we' because this is all new to me, and we have been together for five and a half years."

471.    ANDERSON indicated he needed to end the conversation because he had to go to a meeting.

Complaint
Webb, et al. v. County of Stanislaus, et al.
U.S. District Court – Eastern District of California
Case No.

472.     On more than one occasion during Taylor's stay at Paula's home, Paula would get angry with Taylor, when Taylor would not agree with her that Taylor had to get away from Jeremy, and he was abusive and/or violent, things Paula herself had acknowledged were false.

473.     Paula said on more than one occasion, words to the effect of, "CPS (CSA) has given me custody of A.W., and CPS is always going to be involved in your life, and you're going to have to choose between A.W. or Jeremy."

474.     This reference to "choosing" between Jeremy and A.W. was expressed by Paula to Taylor no less than a half of a dozen times during the period commencing with the CSA social workers removing A.W. on October 31st, 2019.

475.     While at the home Taylor heard Paula on the phone speaking to one of Paula's aunts on the phone, telling the aunt that, "I did make a false statement about Jeremy so I could have A.W. removed and get custody of her for her safety, they can be mad at me I don't give a shit."

476.     Taylor made a plan with a Westfall family relative and her attorney, to leave her mother's home with A.W., and on November 20th, 2019, while Paula took a nap, Taylor gathered up a few items and her daughter A.W., and walked out of Paula's home.

477.     She traveled to California directly, stopping only for food and gas.

478.     Later that same evening, Utah law enforcement officers on both the state and local level, began a search for Taylor and A.W.

479.     No Utah law enforcement entity, however, contacted California and requested that they activate an Amber Alert covering California.

480.     An "Amber Alert" was put out in Utah which falsely portrayed A.W. as a "victim," and a Clinton Police Department spokesman claimed on Utah television media that A.W. was in some kind of serious danger, which was also false.

481.     Pictures of A.W. and Taylor were splashed across the local Clinton and Utah media, and Clinton Police Department also posted the Amber Alert on their own Facebook site.

482.     Jeremy Westfall has, at the time of the filing of this Complaint, has not seen his newborn daughter, or his girlfriend, partner, and mother of his child, in over two months.

483.     On the date of filing this Complaint, Fort Bragg Police Department showed up at the Crespo residence, claiming they had been sent by Stanislaus County to perform a welfare check on Taylor and A.W.

484.     PLAINTIFFS are informed and believe that Stanislaus County has now obtained a warrant to remove A.W. from Taylor's care.

485.     Taylor and A.W. are still not safe from the retaliatory actions and interferences of COUNTY in their lives.

**IV**

**DAMAGES**

486.     As a result of the conduct of Defendants, all PLAINTIFFS suffered severe emotional distress, anxiety, and general damage to their psyche to such an extent as to cause physical manifestations of pain and symptoms of nausea and severe depression.  These related symptoms included but were not limited to sleeplessness and sleep disturbance, headaches, fatigue, malaise, irritability, an inability to focus, a generalized fear of authority figures and social workers, as well as a loss of appetite and loss of weight.  The removal and continued separation of the parents and children caused humiliation and embarrassment and loss of

reputation in the community to PLAINTIFFS. PLAINTIFFS are also informed and believe, and thereupon allege, that they were placed on various state and local database registries for perpetrators of child abuse, further damaging their reputation and likely causing damages in the future in their rights of membership, society, community participation, and association. Damage to the PLAINTIFFS was severe and is enduring.

487.     PLAINTIFFS seek an award of exemplary (punitive) damages under federal law and pursuant to California Civil Code §3294 to make an example of and punish the individually named non-entity defendants, and in the hope of deterring future conduct of a similar nature. The acts and omissions of Defendants COBBS, JONES, DOE 1, and DOE 2, complained of herein are malicious, oppressive, borne of deliberate indifference, shocking to the conscience of the reasonable person, and despicable in the extreme, and as such, entitle PLAINTIFFS to an award of punitive damages.

**V.**

**CLAIMS FOR RELIEF**

**1st CLAIM FOR RELIEF**
14th Amendment – Removal – Procedural Due Process
[Taylor v. Anderson, Cobbs, Jones, DOE 1, DOE 2]

488.     Taylor re-alleges and incorporates PARA1-PARA2, inclusive, as though fully set forth at this point, as they relate to a cause of action for a violation of her procedural due process rights under the 14th Amendment to the United States Constitution, with regard to the warrantless interference of her rights of familial association with her daughter A.W. by ANDERSON, COBBS, JONES, DOE 1, and DOE 2 on October 31st, 2019, occasioned by the unlawful removal of A.W. from her care, custody, and control in the absence of a warrant, and

without circumstances of an imminent risk of serious bodily injury, consent, or insufficient time to seek a warrant.

489.    Taylor alleges the conduct of ANDERSON, COBBS, JONES, DOE 1, and DOE 2 in removing A.W. in the absence of any imminent risk of serious bodily injury, without consent or having procured a warrant, violated her procedural due process rights in violation of Taylor's 14th Amendment rights of familial association.

490.    Taylor is informed and believes, and thereon alleges, that ANDERSON was consulted with, and agreed with, the removal of A.W. from her mother Taylor on 31st of October, 2019, and/or, ANDERSON did ratify the conduct of social workers COBBS and JONES in removing A.W. from her mother Taylor on said date.

491.    Taylor re-alleges DAM1 as said damages relate to a claim for relief for a violation of Taylor's 14th Amendment procedural due process rights as stated.

492.    The punitive damage allegations of DAM2 apply in this cause of action as against ANDERSON, COBBS, JONES, DOE 1, and DOE 2 for the violation of Taylor's rights as stated, as against Defendants ANDERSON, COBBS, JONES, DOE 1, and DOE 2's acts and omissions complained of herein were undertaken in willful, malicious, reckless disregard of Taylor's rights, thereby entitling Taylor to punitive and exemplary damages.

**2nd CLAIM FOR RELIEF**
14th Amendment – Removal – Procedural Due Process
[Jeremy v. Anderson, Cobbs, Jones, DOE 1, DOE 2]

493.    Jeremy re-alleges and incorporates PARA1-PARA2, inclusive, as though fully set forth at this point, as they relate to a cause of action for a violation of his procedural due process rights under the 14th Amendment to the United States Constitution, with regard to the warrantless interference of his rights of familial association with his daughter A.W. by

ANDERSON, COBBS, JONES, DOE 1, and DOE 2 on October 31st, 2019, occasioned by the unlawful removal of A.W. from his care, custody, and control in the absence of a warrant, and without circumstances of an imminent risk of serious bodily injury, consent, or insufficient time to seek a warrant.

494.     Jeremy alleges the conduct of ANDERSON, COBBS, JONES, DOE 1, and DOE 2 in removing A.W. in the absence of any imminent risk of serious bodily injury, without consent or having procured a warrant, violated his procedural due process rights in violation of Jeremy's 14th Amendment rights of familial association.

495.     Jeremy is informed and believes, and thereon alleges, that ANDERSON was consulted with, and agreed with, the removal of A.W. from her father Jeremy on the 31st of October, 2019, and/or, ANDERSON did ratify the conduct of social workers COBBS and JONES in removing A.W. from his father Jeremy on said date.

496.     Jeremy re-alleges DAM1 as said damages relate to a claim for relief for a violation of Jeremy's 14th Amendment procedural due process rights as stated.

497.     The punitive damage allegations of DAM2 apply in this cause of action as against ANDERSON, COBBS, JONES, DOE 1, and DOE 2 for the violation of Jeremy's  rights as stated, as against Defendants ANDERSON, COBBS, JONES, DOE 1, and DOE 2's acts and omissions complained of herein were undertaken in willful, malicious, reckless disregard of Jeremy & Jeremy's rights, thereby entitling Jeremy punitive and exemplary damages.

### 3rd CLAIM FOR RELIEF
4th Amendment – Seizure
[A.W. v. Anderson, Cobbs, Jones, DOE 1, and DOE 2]

498.     A.W. re-alleges and incorporate PARA1-PARA2, inclusive, as though set forth fully at this point, as they relate to a claim for relief against ANDERSON, COBBS, JONES, DOE

1, and DOE 2, for a violation of A.W.'s 4th Amendment right against unreasonable seizure on October 31st, 2019.

499.     In undertaking to seize A.W. on October 31st, 2019, the Defendants acted without any reasonable cause justifying the seizure of A.W. and without a single fact known to Defendants that would constitute either consent, or waiver, or any other circumstances constituting exigency and/or rendering inapplicable the warrant requirements of the 4th Amendment.

500.     A.W. re-alleges DAM1 as said damages relate to a claim for relief for a violation of A.W.'s civil rights for seizure of her person in violation of her own rights to be free from unreasonable seizure and to the care, custody, and control of her parents Jeremy & Taylor.

501.     The punitive damage allegations of DAM2 apply in this cause of action as against ANDERSON, COBBS, JONES, DOE 1, and DOE 2 for the violation of A.W.'s rights as stated as against Defendants ANDERSON, COBBS, JONES, DOE 1, and DOE 2's acts and omissions complained of herein were undertaken in willful, malicious, reckless disregard of A.W.'s rights, thereby entitling A.W. to punitive and exemplary damages.

### 4th CLAIM FOR RELIEF
14th Amendment – Coerced Safety Plan & Requirements
[Taylor v. Anderson, Tout, Cobbs, Jones]

502.     Taylor re-alleges and incorporates PARA1-PARA2, inclusive, as though fully set forth at this point, as they relate to a claim for relief against ANDERSON, COBBS, JONES, and TOUT for a violation of her 1st Amendment rights of association, and a violation of her 14th Amendment substantive due process rights, as described hereinabove and occurring in the "TDM" meeting held November 1st, 2019, and/or occurred as a result of the TDM and the

Complaint
Webb, et al. v. County of Stanislaus, et al.
U.S. District Court – Eastern District of California
Case No.

"Action Plan" and/or "Safety Plan" that Taylor was forced to sign, as an ultimatum with custody of her newborn breastfeeding infant in the balance.

503.    Specifically, all the subsequent actions Taylor had to take as memorialized in the "Safety Plan," in order to have A.W. returned to her constituted constitutional violations of her substantive due process rights;

> 1 – Taylor's rights of freedom of association as protected by the 1st Amendment to the U.S. Constitution were interfered with in that she could not visit Jeremy when in possession of A.W., a newborn infant whom Taylor was breastfeeding;
>
> 2 -  including filing false claims in in a Superior Court proceeding to take away all legal rights of Jeremy Westfall to his child, which she had to sign under penalty of perjury, but for which she knew the claims had numerous false and misleading claims as to her own personal knowledge of the "facts" as to her relationship with Jeremy Westfall;
>
> 3 – having to quit/leave her employment;
>
> 4 – having to move her and A.W. from their home in Modesto, California, to the abusive and hostile environment of her mother's home in Clinton, Utah, some 780 miles away.

504.    In undertaking to coerce and threaten Taylor with the removal and/or continued detention and/or ultimate loss of her child, without legal justification for doing so without a warrant and there existing no circumstances at the time that would excuse the obtaining of a warrant, the aforementioned Defendants brought to bear the most egregious of pressures upon twenty-five (25) year old Taylor who had just given birth to her first child a mere four (4)

days earlier, and whom had also already suffered the psychological trauma of the unlawful removal of her daughter the day prior.

505.     The Defendants conduct was abusive, malicious, and undertaken with complete disregard for the constitutional rights of Taylor to associate with whom she wished, and not associate with whom she did not wish to associate under the 1st Amendment.

506.     The Defendants conduct was abusive, malicious, and conscious shocking in that it evidenced complete disregard and deliberate indifference to Taylor's substantive due process rights and constitutional familial association rights vis-à-vis her child A.W. under the 14th Amendment.

507.     Taylor re-alleges DAM1 as said damages relate to a claim for relief for a violation of Taylor's 1st Amendment rights of freedom of association and 14th Amendment substantive due process rights as stated.

508.     The punitive damage allegations of DAM2 apply in this cause of action as against ANDERSON, COBBS, JONES, and TOUT, for the violation of Taylor's  rights as stated, as Defendants ANDERSON, COBBS, JONES, and TOUT's acts and omissions complained of herein were undertaken in willful, malicious, reckless disregard of Taylor's rights, thereby entitling Taylor to punitive and exemplary damages.

**5th CLAIM FOR RELIEF**
14th Amendment – Coerced Safety Plan & Requirements
[Jeremy v. Anderson, Tout, Cobbs, Jones]

509.      Jeremy re-alleges and incorporates PARA1-PARA2, inclusive, as though fully set forth at this point, as they relate to a claim for relief against ANDERSON, COBBS, JONES, and TOUT for a violation of his 14th Amendment substantive due process rights, as described hereinabove and occurring in the "TDM" meeting held November 1st, 2019, and/or occurred

Complaint
Webb, et al. v. County of Stanislaus, et al.
U.S. District Court – Eastern District of California
Case No.

as a result of the TDM and the "Action Plan" and/or "Safety Plan" in which Jeremy was forced to consent to a waiver of the right to seek legal redress of the removal of all legal rights to his newborn infant daughter A.W.

510.    Specifically, Jeremy had to consent to a verbal waiver of his right to contest the removal of all legal rights to his child A.W., due to the threat of the named Defendants that his child would be removed and/or continue to be detained not only from Jeremy himself, but from the child's mother, and, suffer placement in foster care.

511.    In undertaking to coerce and threaten Jeremy with the removal and/or continued detention and/or ultimate loss of his child, without legal justification for doing so without a warrant and there existing no circumstances at the time that would excuse the obtaining of a warrant, the aforementioned Defendants brought to bear the most egregious of pressures upon Jeremy, whose girlfriend and partner of over five (5) years had just given birth to their first child together a mere four (4) days earlier.

512.    The Defendants conduct was abusive, malicious, and undertaken with complete disregard for the constitutional rights of Jeremy to associate with whom he wished, and not associate with whom he did not wish to associate under the 1st Amendment.

513.    The Defendants conduct was abusive, malicious, and conscious shocking in that it evidenced complete disregard and deliberate indifference to Jeremy's substantive due process rights and constitutional familial association rights vis-à-vis his child A.W. under the 14th Amendment.

514.    Jeremy re-alleges DAM1 as said damages relate to a claim for relief for a violation of Jeremy's 1st Amendment rights of freedom of association and 14th Amendment substantive due process rights as stated.

515.     The punitive damage allegations of DAM2 apply in this cause of action as against ANDERSON, COBBS, JONES, and TOUT, for the violation of Jeremy's rights as stated, as Defendants ANDERSON, COBBS, JONES, and TOUT's acts and omissions complained of herein were undertaken in willful, malicious, reckless disregard of Jeremy's rights, thereby entitling Jeremy to punitive and exemplary damages.

### 6th CLAIM FOR RELIEF
4th Amendment – Seizure, Go Utah, File Papers
[Taylor v. Anderson, Tout, Cobbs, Jones]

516.     Taylor re-alleges and incorporates PARA1-PARA2, inclusive, as though fully set forth at this point, as they relate to a claim for relief against ANDERSON, COBBS, JONES, and TOUT for a violation of her 4th Amendment rights against unreasonable seizure.

517.     In requiring that Taylor move anywhere, irrespective of the fact in this case it was a move of over 780 miles to another state (Utah), the Defendants interfered in Taylor's liberty interest in going about her business.

518.     In requiring that Taylor go to the Superior Court and file papers seeking to remove all legal rights of Jeremy to his daughter, Defendants interfered in Taylor's liberty interest in going about her business.

519.     In both of the foregoing instances, no reasonable person faced with government actors – three in number speaking, four in the TDM meeting room – acting on behalf of an agency that had already unlawfully removed that persons newborn child, and is then threatening to continue to detain that child in foster care with the advisement that the child may never be returned if their demands are not met or requirement satisfied, would have felt free to ignore the demands of the Defendants as to where she could and could not go while in the possession of her newborn infant.

Complaint
Webb, et al. v. County of Stanislaus, et al.
U.S. District Court – Eastern District of California
Case No.

520. Taylor re-alleges DAM1 as said damages relate to a claim for relief for a violation of Taylor's 1st Amendment rights of freedom of association and 4th Amendment right against unlawful search and seizure as stated.

521. The punitive damage allegations of DAM2 apply in this cause of action as against ANDERSON, COBBS, JONES, and TOUT, for the violation of Taylor's rights as stated, as Defendants ANDERSON, COBBS, JONES, and TOUT's acts and omissions complained of herein were undertaken in willful, malicious, reckless disregard of Taylor's rights, thereby entitling Taylor to punitive and exemplary damages.

**PRAYER FOR RELIEF,**

WHEREFORE, PLAINTIFFS respectfully request that this Court:

1.) Award PLAINTIFFS general, special and compensatory damages in an amount to be proven at trial;

2.) Award PLAINTIFFS punitive damages against individually named Defendants, and each of them, for their extreme and outrageous conduct in complete disregard for the rights of the PLAINTIFFS;

3.) Award PLAINTIFFS statutory damages and/or attorney's fees against all Defendants as allowed by 42 U.S.C. §1988 and C.C.P. §1021.5;

4.) Grant PLAINTIFFS such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

POWELL & ASSOCIATES

DATED: December 9, 2019          _____/s/Robert R. Powell_____
                                                          ROBERT R. POWELL, ESQ.
                                                          Attorney for PLAINTIFFS